STATE, RESPONDENT, *v.* NORDALL, APPELLANT.

(No. 2,651.)

(Submitted December 24, 1908. Decided February 15, 1909.)

[99 Pac. 960.]

*Criminal Law—Homicide—Corpus Delicti—Proof—Evidence—
Admissibility—Exhibits—Exclusion—Remarks of Court.*

Homicide—*Corpus Delicti*—Proof.

1. In a prosecution for murder, the only fact required to be proved
directly, under section 8298, Revised Codes, is the death of the
person alleged to have been killed, and not the identity of the de-
ceased or the fact that the killing was done by the defendant.

Same—Circumstantial Evidence—Admissibility.

2. Where the state relied on circumstantial evidence to convict the
defendant of murder, everything found in and about the burned
ruins of the cabin in which a family of five was found dead,
which tended to enlighten the jury and enable them to determine
the ultimate question of the guilt or innocence of the defendant, was
properly admitted in evidence.

Same—Exhibits—Exclusion—Remarks of Court—Prejudice.

3. The murder with which defendant was charged was committed
in January. After the crime evidences of coal-oil were found on de-
fendant's overalls and overshoes. On the trial witnesses for the
defendant testified as to experiments made by them at the time of
the trial (in June) by pouring coal-oil on overalls and overshoes, but
no attempt was made to show what, if any, effect the difference
in temperature and atmospheric conditions would have upon the ten-
dency of oil to soak into substances or evaporate. When the
articles with which the experiments had been made were offered
in evidence, the court rejected them with the remark that, without
showing such conditions, the experiments were worthless. After-
ward, however, the court offered to allow the articles to go in evi-
dence, provided defendant's counsel would put an analytical chemist
on the stand to testify to the effect of temperature on evaporation
of coal oil. This offer was declined. *Held,* that under the circum-
stances prejudicial error was not committed, either in rejecting the
exhibits or in making the remark that without such showing the
evidence offered was worthless.

*Appeal from District Court, Fergus County; E. K. Cheadle, Judge.*

OLE NORDALL was convicted of murder in the first degree, and from the judgment and from an order denying a new trial, he appeals. Affirmed.

## STATEMENT OF THE CASE, BY THE JUSTICE DELIVERING THE OPINION.

There are two appeals in this case,—one from a judgment of conviction of murder in the first degree, and one from an order of the district court of Fergus county denying the defendant's motion for a new trial.

The following statement of facts, taken from the brief of counsel for the defendant, will probably do him no injustice:

The defendant and a family by the name of Schluter, the members of which consisted, at the time of the alleged offense, of a mother and four children, lived near the Musselshell river in Fergus county, about two miles apart, and had been, according to the testimony of the defendant, close friends ever since the Schluter family, including the father, who died about the 5th of December, 1907, arrived in that part of the country some four years previous. The defendant during his residence there had been engaged in the cattle business, for two or three years past had rented winter pasture from the Schluters, and, when his cattle were up there, was in the habit of going up every day. During his acquaintance with the family he had performed many kindly acts for them, and when the father died he contributed to a fund of $100 raised by the neighbors for the destitute family, the sum of $25. Sometime in the month of December the defendant, on account of shortage of feed, took his cattle from the Schluter field and to the hills back of his own ranch, holding his own fields for bad weather, and daily riding to hold his cattle together. Nearly every day he had occasion to ride in the direction of the Schluter ranch to turn back his cattle, and he testified that he had not been there for a week

or ten days before the fire hereinafter referred to. On Thursday evening, about 12 o'clock, a stranger named Mullinbrook, who was not sworn at the trial, and who was staying at the ranch of a Mr. Anderson, the Schluter's nearest neighbor, a distance of about three-quarters of a mile away, discovered that the Schluter buildings were on fire, and, upon going with Mr. and Mrs. Anderson to the Schluter ranch, which they did at once, found that the house was almost entirely consumed. They called aloud, and receiving no response, made up their minds that the family had probably gone to Anderson's by another road, and upon their return home, not finding them there, concluded that they must have gone to some other neighbors. The next morning at about 8 o'clock they went again to the Schluter ranch, at that time saw what they took to be a portion of an arm of a human being protruding from the ruins. They found at that time certain footprints made by some one wearing overshoes, which tracks led from the house to a storehouse a short distance away, back again to the house, and to the river. Witness Anderson, who first saw these tracks, noticed nothing peculiar about them at that time. He immediately rode up the river advising Mr. Harding of the fire. It does not appear that any person noticed anything peculiar about these tracks until the Tuesday following, when the inquest was held, and after the county attorney had placed a pair of left overshoes belonging to the defendant in the tracks. Saturday morning W. C. Niles, a witness for the state, with other witnesses, made an examination of the overshoe tracks, and while he thought there was something peculiar in their looks, he did not have the idea that they were made by two left overshoes, nor indeed did he at any time draw this conclusion. A number of neighbors arrived at the scene of the fire on Saturday, and the witnesses Harding and Niles measured the overshoe tracks, marking the length and width upon sticks, which, however, were not produced at the inquest or on the trial, but were lost or mislaid by the witness Harding, who was told by the county attorney that it was not necessary to keep them.

The defendant, who lived about two miles from the Schluters and where the ranch of the Schluters cannot be seen from his place, was first advised of the fire by his nearest neighbor, Mr. Bart, on the evening of Sunday, the 19th. He at first appeared to think it was a joke being played upon him by Mr. Bart, and expressed surprise at the news, but on discovering that it was a fact, stated his intention to go to the inquest, supposed to be held the next day. He did so, and remained there with neighbors nearly all day, and returned to his home that evening, accompanied by the witness Fallon and one Nordquist, who remained with him that evening, and the next day they returned to the scene of the fire, and on the arrival of the coroner that afternoon an inquest was held. The defendant assisted in digging out of the ruins what were afterward identified by the coroner as parts of human bodies, and was asked by the sheriff to be one of the coroner's jury. The defendant testified that he had no idea that he was suspected of any offense. He did not, however, act as a juror, as he was not summoned, but was afterward called before the jury and sworn as a witness. After being warned by the county attorney that he did not have to submit to measurements of his feet unless he wished, he permitted them to measure his shoes, telling them the size of the overshoes he wore; and, after being again advised that he need not agree to it unless he wished, he was asked if he had any objections to their sending for the overshoes, and replied that he had not, and told where they could be found. The witness Lugo. who was sent for the shoes, found them in the place indicated, and upon their being brought defendant admitted that they were his overshoes. An examination disclosed that there was frozen blood on the bottom of them, in the hollow between the heel and the sole, and that a human hair was attached to the shoe, glued on by blood. The house in which the defendant lived consisted of two rooms and a storehouse adjoining, which was a separate building with a separate entrance. The overshoes were found on the floor, in open view near the kitchen stove. There was no lock upon the door of the house, and never had

been, the fastening consisting of a strap over a nail. The door on the storehouse was fastened by a hasp and staple and a Yale lock, but the staple was broken through the center, and the defendant was in the habit of unfastening it by simply "wiggling" it through the break in the staple. There was a window in this storeroom, which was set in from the outside and secured by nails which could be easily turned back and the window removed.

At the conclusion of the inquest the defendant was placed under arrest, and at his request Mr. Bart rode his horse home and stayed at his house, looking after his cattle, until some time in the following spring. The saddle ridden at that time by defendant, and which was the only serviceable one he had, was, as soon as counsel was retained by the defendant, brought to the county seat, sealed up, and the seals broken in court at the time of the trial. There were no marks of coal-oil on the leather, nor were there any marks of blood upon his stirrups. The evening of the defendant's arrest he was taken to the house of Mr. Harding, and the sheriff requested the witness Niles to examine the defendant's house for further evidence. This was done, and a pair of overalls and a blood-stained hat, rolled up and pushed down behind a trunk in the storeroom, were found, and in a cupboard in the storeroom, among other dirty clothes, a blood-stained pair of drawers. There was also coal-oil on the overalls and on the drawers. At the same time these articles were found there was also found a blouse with blood on it, and a pair of suspenders with blood thereon; also a shirt with blood spattered on it, and another clean shirt with some red substance on the cuff. The defendant testified that he had not worn the hat for several months, except once, when he killed a beef, some time in December, 1907. He testified that he had not worn the suspenders for about a year and a half, and explained the blood on the overalls and hat as having been gotten on by killing animals. The presence of the hair upon the overshoe he explained by saying that he, with the assistance of Mrs. Schluter and her daughter, killed and dressed a pig at Schluter's some-

time in the month of December, probably about the middle of the month, and the blood on the overshoes was explained in the same way. As to the coal-oil found upon the overalls, the drawers, and the overshoes, the defendant said he had no knowledge of coal-oil being upon them. He stated that the last time he saw the hat, overalls, and drawers there was no coal-oil upon them, nor were any of them behind the trunk in the store-room, but in another part of the room. The articles described as having been found behind the trunk, the pair of drawers found in the closet, and the overshoes were given to an analytical chemist, who made an examination of the blood stains, and on the trial was unable to say whether or not the blood was that of a human being or some other mammal. Defendant denied any knowledge whatever of the alleged offense, and stated that he had no knowledge of the burning of the house until apprised of it by Mr. Bart, on Sunday, the 19th of January.

Two days after the inquest the witnesses Niles, Harding and Rowton went to defendant's place, and from a field in which he kept his saddle horses, five in number, one side of the field being bounded by the river, took a horse of defendant's called "Nig" to the place where they claimed a hoof print showed on the bank of the river nearly opposite the Schluter home, and where, according to the state's theory, the assassin left his horse on the night of the fire, and compared the track of the horse Nig with that at that point. They stated that they followed this hoof print down a bridle trail in the direction of the defendant's house for a short distance, when they lost it, but that about half a mile farther on they picked it up again, and followed it still farther toward the defendant's ranch. The witness Niles, while testifying that the hoof mark was peculiarly shaped, could not say that other horses in that part of the country would not make similar tracks. The marks of reins dragging on the dust were found at the place where the horse was supposed to have been left by the assassin, but no place was found where the horse had been tied, although inspection was made to find such a place. Testimony was introduced by the

defense to the effect that the horse Nig would not stand without being tied, any length of time. The defendant claimed to have ridden the horse Nig, at times during the week preceding the fire, after cattle up and down the river as usual, over the range, and on the same bridle trail where these marks were stated to have been found by the witnesses. The horse, when taken by these witnesses from the pasture, seven days after the fire, showed sweat marks. At the time the bodies were taken from the ruins it was found that four of them were lying in their beds in their accustomed places along the wall, but that a fifth body, identified from the pelvic bones by the coroner as that of an adult female, was found near the door lying upon the side of the ridge pole, which had fallen between her and the other bodies, precipitating the dirt roof to the floor. In the extreme corner of the room lay another adult female body, on the bed and springs occupied and used by Bertha Schluter, the mother, for the killing of whom the defendant was convicted. Three guns, comprising a 22-rifle, a 35-70 Winchester, and a shotgun, or rather the barrels of these guns, were found in the place where they were usually kept, in the sleeping-room occupied by the Schluter family. The coroner, Dr. Attix, distinctly stated that he discovered no marks of violence upon any of the bodies, and that it was impossible for any person to do so, for the reason that they were all practically consumed by the fire, only a few bones which could be identified as human bones remaining. The defendant had lived in Montana for the past eighteen years, and has never been arrested for any offense.

In addition to the foregoing, testimony was produced to the following effect: That the Schluter family, consisting of Bertha Schluter, Martha Schluter, her eldest daughter, a girl of about fourteen years of age, and three younger children, were seen at their home on the afternoon preceding the fire, which took place on the night of the 16th of January, 1908. They have never since been seen. They were in reasonably good health the day before the fire. The family owned a shepherd dog, which was never allowed to be in the house, and the bones of the head of

a dog were found in the ruins after the fire.  The Schluters had a can-of coal-oil in their storehouse prior to the fire, and on the morning after the fire two battered coal-oil cans were found in the ruins, and the witnesses discovered that the storehouse door was open, and a strap, with which it was usually fastened, was broken from the door and hung on a nail in the door jamb.  The state produced testimony to the effect that the horse Nig would stand without being tied; also to the effect that there were spots which looked like blood on the defendant's saddle and rope.  The $25 check testified to by the defendant was not produced at the trial, although it was drawn on a bank at the county seat; but the defendant produced his check-book showing a stub which he said belonged to the check.  The state's witnesses testified that during the investigation the defendant appeared very nervous, and that he bore on his face and one of his hands many scratches that appeared to be made by finger nails.  The defendant explained these marks by saying that one of his horses had "bucked" with him into the brush, and that he received the scratches in this manner.  Witnesses also testified that defendant's mustache and eyebrows were badly singed when they first noticed him after the fire, and that his neck appeared to be scorched on one side.  He explained this by saying that he had burned some old fences about the 10th of January.  This latter testimony, however, was somewhat contradicted by a witness, who said that he saw the defendant burning the old fences, and that the fire was not nearly as large as the defendant testified it was, and that after having started it, the defendant went to plowing, and did not go back to the fire until it was nearly out.  The defendant also testified that his mustache was badly scorched in December by the flame of a stove, and that he was about the open fire at the Schluter house, but he did not undertake to say positively that the condition of his mustache and eyebrows after the fire was attributable to any of these experiences.  In fact he said that he did not know anything about his mustache and eyebrows being burned at the time of the inquest, until they asked him about it.  The foot-

prints about the Schluter cabin, and down to the river bank, where the horse had apparently been tied, were all made by two left overshoes, and the defendant's overshoes were both lefts. Diamond-shaped indentations were found in the tracks, similar to those in the soles of the overshoes. Witnesses testified that Mrs. Schluter appeared to be afraid of the defendant, and did not want him around the house at all; that the defendant had stated that he had poked Martha in the ribs, and he expected that they would have him arrested for it; also that the defendant had taken his cattle out of the Schluter field, and had stated that he had told them that he had befriended them, but that it seemed as though his efforts were not appreciated, and he guessed the best thing he could do would be to go away and not go to their house in the future. The hair on the defendant's overshoe was about the color of Martha's hair, and there was bright red blood on the overalls found with the hat. The coroner, who was a physician, testified that the bodies appeared to have been subjected to a "terrific" amount of heat. The defendant killed a pig for Mrs. Schluter about the 10th of December, and a beef two or three weeks after that date. He also butchered a pig on January 5, but the witness who assisted him testified that he did not think defendant got any blood on his clothing at that time, except a little on the cuff of his shirt.

*Mr. J. C. Huntoon*, and *Mr. O. W. Belden*, for Appellant.

The main point in this appeal is that there is an entire absence of the proof necessary to establish the *corpus delicti*. In *State* v. *Pepo*, 23 Mont. 473, 59 Pac. 721, and *State* v. *Calder*, 23 Mont. 504, 59 Pac. 903, as we understand the opinions, it was held that in order to satisfy section 8298, Revised Codes, there must be direct proof of the death, caused by criminal means, of the person alleged to have been killed.

The chief fact to be proved in the case at bar, and the fact upon which the case for the state rested entirely, was: Did Bertha Schluter come to her death by criminal means? If that

is not proved by direct evidence, as we look at it, there is no case established.    There was no attempt even, to prove that she came to her death by violence inflicted by any person—that is any direct proof of that fact.    Independent of our statute, it has always been the rule of law, that there must be some proof that a death was caused by violence inflicted by another, under circumstances rendering the infliction of that violence criminal, before there can be a conviction, and failure to prove by what means the deceased came to his death is fatal to a conviction.    *(Cole* v. *State,* 59 Ark. 50, 26 S. W. 377; *Conde* v. *State,* 35 Tex. Cr. 98, 60 Am. St. Rep. 22, 34 S. W. 286; *People* v. *Callego,* 133 Cal. 295, 65 Pac. 572; *Herren* v. *People,* 28 Colo. 23, 62 Pac. 833; *Ruloff* v. *People,* 18 N. Y. 179; *People* v. *Bennett,* 49 N. Y. 137; *Lucas* v. *State,* 19 Tex. App. 79; *Hunter* v. *State,* 34 Tex. Cr. 599, 31 S. W. 674; *Dreessen* v. *State,* 38 Neb. 375, 56 N. W. 1024; *People* v. *Simonsen,* 107 Cal. 345, 40 Pac. 440; see, also, *People* v. *Swetland,* 77 Mich. 53, 43 N. W. 779; *People* v. *Ward,* 134 Cal. 301, 66 Pac. 372.)    As to what is sufficient to justify a verdict, even under statutes not requiring direct proof, and for a full discussion of insufficiency of evidence in a case of this kind, see *State* v. *Pagano,* 7 Wash. 549, 35 Pac. 387; *People* v. *Tapia,* 131 Cal. 647, 63 Pac. 1001; *Territory* v. *Rehberg,* 6 Mont. 467, 13 Pac. 132.    In the absence of proof upon a vital point it is the duty of the court to direct verdict of not guilty.    (*State* v. *Welch,* 22 Mont. 92, 55 Pac. 927.)

Remarks of the court are frequently considered by the jury as having much more weight than the arguments of counsel; and when the court says that a piece of evidence offered is entitled to no weight, because of certain reasons he points out, he is commenting on what weight they should attach to it, and in effect telling them what his opinion of it is, and they generally follow his remarks.    This is error.    (*Singer Mfg. Co.* v. *Greenleaf,* 100 Ala. 272, 14 South. 109; *Deshler* v. *Beers,* 32 Ill. 368, 83 Am. Dec. 274; *West* v. *Black,* 65 Ga. 647; *Brunker* v. *Cummins,* 133 Ind. 443, 32 N. E. 732; *McKissick* v. *Ore. Short Line,*

13 Idaho, 195, 89 Pac. 629; *State* v. *Shuff*, 9 Idaho, 115, 72 Pac. 664; *Kroetch* v. *Empire Mill Co.*, 9 Idaho, 277, 74 Pac. 868.)

*Mr. Albert J. Galen*, Attorney General, and *Mr. E. M. Hall*, Assistant Attorney General, for Respondent.

MR. JUSTICE SMITH delivered the opinion of the court.

It is contended by the appellant that there is in the record an entire absence of proof necessary to establish the *corpus delicti.* Section 8298, Rev. Codes, is relied on. It reads as follows: "No person can be convicted of murder or manslaughter unless the death of the person, alleged to have been killed, and the fact of the killing by the defendant as alleged, are established as independent acts; the former by direct proof and the latter beyond a reasonable doubt." The position of counsel is thus stated in their brief: "The chief fact to be proved in the case at bar, and the fact upon which the case for the state rested entirely, was, 'Did Bertha Schluter come to her death by criminal means?' If that is not proven by direct evidence, there is no case established." The first case cited in support of this contention is *State* v. *Pepo*, 23 Mont. 473, 59 Pac. 721. The main question considered in that case was whether the identity of the deceased must be established by direct proof. It was held that the law does not require direct proof of the identity of the victim, but only of death. The court then proceeds to say, commenting upon the opinion of Judge Finch, in *People* v. *Palmer*, 109 N. Y. 110, 4 Am. St. Rep. 423, 16 N. E. 529: "It is made clear by the learned opinion of Judge Finch that the *corpus delicti* means the existence of a criminal fact. That such a fact exists is directly proved when a dead body is found under circumstances such as were brought out on the trial of this case. But by requiring the *corpus delicti* to be established by direct proof the law does not include the identity of the murdered man, but leaves that open to indirect or circumstantial evidence, to be established on the trial." It will be observed that the court held that the *corpus delicti* or the existence of the

criminal fact was directly proved in the *Pepo Case*. In the next
sentence, however, the court inadvertently used the expression
*"corpus delicti"* in such a way as to indicate that all of the
elements going to make up the existence of the criminal fact must
be established by direct proof. The reason undoubtedly was that
that was not the precise point under consideration. For the stat-
ute does not say so. The statute says that the death of the person
alleged to have been killed  must be established by direct proof.
And the court was in reality not unmindful of this, because it
quoted with  approval the words of  Judge Finch, as follows:
"The requirement of the Code goes upon the assumption that
the identity of the deceased, either by name or description,
has been established in the ordinary way, and then requires that
the death of that person thus identified shall be directly proved,
and the killing by the prisoner of the same person shall be shown
beyond a reasonable doubt." This court recognized the rule
in *State* v. *Calder*, 23 Mont. 504, 59 Pac. 903, where Mr. Jus-
tice Pigott said: "The true meaning of the statute in this re-
spect is that in the proof of the *corpus delicti* there must be
direct evidence establishing the death of a person. The fact
that the decedent is the person alleged to have been killed may
be proved by circumstantial evidence—that is, by inferences
drawn from the facts proved—or it may, of course, be estab-
lished by direct proof. * * * The evidence was sufficient
to satisfy the requirements [of the statute] that the death of the
person alleged to have been killed must be established by direct
proof as a fact independent of the fact of the killing by the de-
fendant." And again: "The *corpus delicti* is the body or sub-
stance of the offense. This means, and has always meant, the
existence of the criminal fact. In prosecutions for murder proof
of the *corpus delicti* involves the establishment of the fact that
a murder has been committed, but includes neither the identity
of the person alleged to have been killed, nor the killing by the
person accused." In the *Calder Case*, therefore, the court, in
effect, held that the fact that the person alleged to have been
killed is dead is the only fact that need be proved by direct

evidence; and to that interpretation of the statute we adhere. And in this case the only fact necessary to be proved directly was that the person *alleged* to have been Bertha Schluter was dead. The fact that the dead body was that of Bertha Schluter and the fact of the killing by the defendant as alleged, might be, and evidently were, in the opinion of the jury established by indirect or circumstantial evidence, which was the only kind of evidence produced on those features of the case.

The trial court, over the objection of the defendant, allowed the state to prove all of the circumstances relating to what was found in and about the ruins of the Schluter home, including the fact that parts of five dead bodies were taken therefrom. No one of these bodies was identified by direct evidence. We find no error in the ruling of the court on this point. It was necessary to prove what was found, and all of the details connected therewith, in order to establish, by circumstantial evidence, "the fact of the killing by the defendant as alleged." All of these facts and circumstances served to enlighten the jury and enable them to determine the ultimate question of the guilt or innocence of the defendant. This evidence, together with other evidence, tended to establish the identity of one of the bodies as that of Bertha Schluter. The family consisted of five persons, and the bodies of five persons were found in the ruins. No one was missing.

What is said above applies equally as well to the testimony of witnesses as to the color of the hair of Martha Schluter, the eldest daughter, and the fact that the hair found on the defendant's overshoe was the same color. It also served to show that the defendant was at a place where he could get hair of that color onto his clothing.

It is also claimed that the court erred in admitting in evidence the bones of the dog, for two reasons: (1) That they were not sufficiently identified as being the bones of the Schluter dog, or as being the same bones taken from the ruins; and (2) as immaterial. We think the evidence was material, for the gen-

eral reasons above stated, and that the exhibits were sufficiently identified.

Certain witnesses, on the part of the defendant, testified to experiments made by them by pouring coal-oil on overalls and overshoes at the time of the trial in June. No attempt was made to show what effect, if any, the difference in temperature and atmospheric conditions would have upon the tendency of coal-oil to soak in or evaporate; and, when the articles with which the experiment was made were offered in evidence, the court rejected them, with the remark that without such additional showing the experiment was worthless. Afterward the court offered to allow the articles to go in evidence, provided defendant's counsel would put the analytical chemist on the stand "to testify to the effect of temperature on evaporation, in order that the jury may understand the probable or proximate effect of the different conditions existing at the time of the Schluter fire and at the time of the experiment." Counsel declined to do this. As a matter of fact, the defendant's witnesses fully stated to the jury the result of their experiments, and the complaint made is that the articles were not admitted in evidence, and the court stated that without additional testimony the experiment was worthless. We have carefully considered this assignment of error, and conclude that the court, under the circumstances, committed no prejudicial error, either in rejecting the exhibits, or in its remark. The experiments were not conducted under substantially the same conditions as had previously existed, and, as the very gist of them was to show what amount of oil would evaporate or soak in, the matter of temperature was vitally important. This is a matter of common knowledge.

The court instructed the jury that the death of the person alleged to have been killed must have been established by direct proof, and also gave the usual instructions relating to circumstantial evidence and reasonable doubt. The jury was told, in the language of the statute, that the fact of the killing by the defendant as alleged must be established to their satisfaction beyond a reasonable doubt. Some general criticisms are made

of the instructions, but mostly with reference to the contention that the felonious killing must be established by direct proof. Our attention has not been called to any reversible error in the instructions.

An examination of the entire record satisfies us that the evidence is sufficient to warrant and support the verdict, and that the defendant had a fair and impartial trial.

The order and judgment are affirmed.

*Affirmed.*

Mr. Chief Justice Brantly and Mr. Justice Holloway concur.