STATE, RESPONDENT, v. RIGGS, APPELLANT.

(No. 4,839.)

(Submitted September 13, 1921.  Decided October 10, 1921.)

[201 Pac. 272.]

*Criminal Law—Homicide—Corpus Delicti—Circumstantial Evidence—Insufficiency.*

Homicide—Circumstantial Evidence—Insufficiency.
1. In a prosecution for murder alleged to have been committed by defendant, the husband of deceased, by striking her a blow on the head and thereafter setting her clothing afire, evidence, circumstantial in character, examined and *held* insufficient to sustain conviction. (MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE REYNOLDS dissenting.)

Same—Evidence—Conjectures—Suspicions—Evidence—Insufficiency.
2. A defendant may not be convicted on conjecture, however shrewd, on suspicion, however justified, on probability, however strong, but only upon evidence which establishes his guilt beyond a reasonable doubt, *i. e.*, upon proof such as to logically compel the conviction that the charge is true.

Same—*Corpus Delicti*—Evidence—Establishes What.
3. In prosecutions for murder, proof of the *corpus delicti* involves the establishment of the fact that a murder has been committed, but it comprehends neither the identity of the person alleged to have been killed nor the killing by the person accused.

Same—Death—Criminal Agency—Proof.
4. In homicide, the fact of the death being established, it must affirmatively be made to appear that it resulted from a criminal agency, that it was not due to natural causes or suicide, but was due to the act of the defendant.

Same—Death—Accident—Natural Causes—Evidence—Insufficiency.
5. Where the evidence, on the one hand, shows that death may have been the result of natural causes or suicide, *or*, on the other, may have been due to criminal agency, a conviction cannot be sustained, since proof of death cannot rest in the disjunctive.

Same—Death—Circumstantial Evidence—Failure of Proof.
6. Where the circumstances relied on by the state to prove that death was caused by the criminal act of another are consistent with the theory that it was produced by natural causes, there is a failure of proof.

Same—Death Due to Criminal or Innocent Cause—Evidence—Rule.
7. Where an act may be attributed to a criminal act or an innocent cause, it will be attributed to the innocent rather than the criminal one.

Same—Circumstantial Evidence—Definition.
8. Circumstantial evidence is the proof of certain facts and circumstances from which the jury may infer other connected facts which

2. For authorities on the law of circumstantial evidence, see notes in 62 Am. Dec. 179; 97 Am. St. Rep. 771.

usually and reasonably follow according to the common experience of mankind, and may be either certain, i. e., that from which the conclusion naturally follows, or uncertain, i. e., that from which the conclusion does not necessarily, but may, follow, and is obtained by process of reasoning only.

Same—Circumstantial Evidence—Sufficiency—Rule.

9. Where a conviction is sought solely on circumstantial evidence, the criminatory circumstances proved must be consistent with each other and point so clearly to the guilt of the accused as to be inconsistent with any rational hypothesis other than his guilt.

Same—Circumstantial Evidence—*Quantum* of Proof Necessary.

10. The same degree of certainty is required to warrant a conviction on circumstantial evidence as when the evidence is direct, and in either case the jury must be satisfied beyond a reasonable doubt before they can find defendant guilty.

Same—Circumstantial Evidence—When Conviction not Sustained.

11. Where the evidence in a criminal cause is unsubstantial or wholly lacking in material particulars, or where it is meager, fragmentary, disconnected or speculative, conviction cannot be sustained.

*Appeals from District Court, Yellowstone County; Charles A. Taylor, Judge.*

GEORGE T. RIGGS was convicted of murder in the first degree, and appeals from the judgment and from an order denying him a new trial. Reversed and remanded, with directions to dismiss the case and discharge the defendant.

*Mr. H. C. Crippen* and *Messrs. Nichols & Wilson,* for Appellant, submitted a brief; *Mr. Crippen* and *Mr. Harry Wilson* argued the case orally.

The court erred in permitting evidence to be admitted concerning remote quarrels between the defendant and the deceased. The rule no doubt is that where there has been mistreatment of the deceased by the defendant continuously for a long period of time, the same can be shown by the state as a part of its case in chief, but that is not the situation here. There were only two quarrels, one about three or four years before March 22, 1918, and the other six or seven years before, and nothing in between to indicate hostility or unfriendliness.

---

9. Exclusion of every reasonable hypothesis except guilt of defendant as necessary to conviction on circumstantial evidence, see note in **Ann. Cas. 1913E, 428.**

Under such circumstances, we submit it was error and very prejudicial to the defendant to allow such testimony to be given. (13 R. C. L., p. 912, sec. 216; *State* v. *Bass,* 251 Mo. 107, 157 S. W. 782, at 787; *Billings* v. *State,* 52 Ark. 303, 12 S. W. 574; *Commonwealth* v. *Abbott,* 130 Mass. 472.)

The evidence is insufficient to sustain the verdict, and is contrary to the law. The *corpus delicti* has not been proved in this case. The court, in Instruction No. 29, told the jury that they "should be convinced by the evidence, beyond a reasonable doubt, of the criminal agency employed in the commission of the crime charged; that is, of the manner in which the death of the deceased was accomplished." The evidence in this case falls far short of that result. The evidence is wholly insufficient not only to fix the crime upon the defendant, but to show, beyond a reasonable doubt, that there was a criminal agency. "Insufficient evidence is, in the eye of the law, no evidence." (*In re Case,* 214 N. Y. 199, 108 N. E. 408; *Jewell* v. *Parr,* 13 Com. B. 916, 138 English Reprint, 1460.) The state's theory is that the deceased was unconscious at the time she was burned; that that unconsciousness was brought about by a blow on the head administered by the defendant.

Starkey, in his work on Evidence, paragraph 863, announces the doctrine that even when the body has been found, and although indications of a violent death be manifest, it shall be fully and satisfactorily proved that the death was neither occasioned by natural causes, by accident, nor by the act of the deceased himself. (See, also, 13 R. C. L. 737.) "The *corpus delicti* is the body or substance of the offense. This means, and has always meant, the existence of the criminal fact." (*State* v. *Calder,* 23 Mont. 505, 59 Pac. 904, at 906.) The death must be shown and the criminal agency. These are questions for the court. (*State* v. *Pepo,* 23 Mont. 473, 59 Pac. 721; *State* v. *Nordall,* 38 Mont. 327, 99 Pac. 960, commenting on *Pepo Case* and *Calder Case.*) And such criminal agency must be proved beyond a reasonable doubt, and cannot rest on

speculation. (Rev. Codes, sec. 8298; *State* v. *Merrill,* 72 W. Va. 500, 78 S. E. 699; *Dreessen* v. *State,* 38 Neb. 375, 56 N. W. 1024; *Taylor* v. *State,* 108 Miss. 18, 66 South. 321; *People* v. *Parmlee,* 112 Mich. 291, 70 N. W. 577; *State* v. *Tittaton,* 159 Mo. 4, 60 S. W. 743; *Martin* v. *State,* 79 Tex. Crim. 393, 186 S. W. 331; *State* v. *Concelia,* 250 Mo. 624, 157 S. W. 776; *Ausmus* v. *People,* 47 Colo. 167, 19 Ann. Cas. 491, 107 Pac. 204; *People* v. *Palmer,* 109 N. Y. 110, 4 Am. St. Rep. 423, 16 N. E. 529.)

The theory of the defense is that the deceased caught fire accidentally. "Where an act may be attributed to a criminal or an innocent cause, it will be attributed to the innocent cause rather than to the criminal one." (*People* v. *Ahrling,* 279 Ill. 70, 116 N. E. 764; *State* v. *Nesenhener,* 164 Mo. 461, 65 S. W. 230; *Abbott* v. *Commonwealth* (Ky.), 42 S. W. 344; *Lovelady* v. *State,* 14 Tex. App. 545; also 17 Tex. App. 286.)

The evidence on the second trial, with regard to the quarrels and with regard to the insurance, is, if anything, less than it was on the first trial. There was no motive for the commission of the crime alleged. "Although motive finds no place in the legal theory of murder, yet in practice it frequently is of great importance. Cases may arise which turn wholly upon the question of whether the evidence discloses a motive for the commission of crime." (Ann. Cas. 1912C, p. 238; *State* v. *Bass,* 251 Mo. 107, 157 S. W. 782, at 787 and 788; *State* v. *Lucey,* 24 Mont. 295, 61 Pac. 994.)

The entire evidence creates only a suspicion or probability of guilt. This is not a sufficient basis for a conviction of crime. (*People* v. *Ahrling,* 279 Ill. 70, 116 N. E. 764; *People* v. *Campagna,* 240 Ill. 378, 88 N. E. 797; *People* v. *Rischo,* 262 Ill. 596, 105 N. E. 8.)

*Mr. Wellington D. Rankin,* Attorney General, and *Mr. L. A. Foot,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Foot* argued the cause orally.

MR. JUSTICE GALEN delivered the opinion of the court.

On the night of March 22, 1918, Matie Riggs, wife of the defendant, was found dead on the kitchen floor of her home. Resulting therefrom, the defendant was charged, by information filed in Yellowstone county, with the crime of murder in the first degree. This is the second time this case has been considered by this court on appeal. On the first appeal, which was taken from a judgment imposing the death penalty, and from an order denying motion for a new trial, the cause was by controlling opinion remanded for new trial, because of insufficiency of the evidence. (*State* v. *Riggs*, 56 Mont. 393, 185 Pac. 165.) From a perusal of the facts recited in the former decision, it would appear that the evidence adduced on the second trial was not materially different from the first. The second trial resulted in a verdict of guilty of murder in the first degree, wherein defendant's punishment was fixed at life imprisonment. The case is now before us as a result of the second trial and the verdict and judgment rendered and entered therein, the appeal being from the judgment and order denying defendant's motion for a new trial.

Ten errors are specified as reason for reversal, but in our view only one is necessary for consideration in order to make complete and satisfactory disposition of the appeal, namely: Is the evidence sufficient to sustain the verdict and judgment?

It appears that the defendant and his wife intermarried at [1] Billings, Montana, in 1901, the wife at that time having an infant child, a girl, named Opal. Nine children were born of the marriage, seven of whom were living at the time of the wife's death. At that time Opal, defendant's stepdaughter, was eighteen years of age, and of the living children of the marriage, Grace was fifteen, Chester thirteen, Bertha twelve, Ida five, Calvin three, Eddie and Roy being younger than Chester, and older than Calvin. At the time of her death, the wife was thirty-nine years of age, and apparently in good physical condition, and the defendant was forty-seven. The

defendant, his wife and children, including Opal, were living, and for seven years had lived, on a forty-acre unit of the "Huntley Reclamation Project," about six miles from the town of Huntley, in Yellowstone county. Their place of abode consisted of a two-story frame house of three rooms. There they lived until the eventful night in March, 1918, and by thrift and industry had accumulated considerable property, the wife at all times doing her full part about the home and farm. On the ground floor there were two rooms, one of which was used as a kitchen and dining-room combined, and the other as a living-room, wherein the wife of the defendant had her bed and slept. The second story comprised one large bedroom, nineteen feet four and one-half inches east to west, by seventeen feet four and one-half inches north to south, located immediately over the living-room, in which second story room the defendant and the children slept in four separate beds. The second story was reached by a stairway three feet one inch in width, running up the west inside wall of the living-room, entrance to which stairway was through a doorway located in the southwest corner of the living-room. This door was used to shut off the stairway and the sleeping quarters upstairs from the ground floor rooms. At the foot of the stairway and immediately opposite the entrance thereto was a window in the west side wall of the house, twenty-four inches wide and fifty-four inches high. There was no closure of the stairway on the second floor. The two-story portion of the house was covered by a gable roof, the kitchen being in a lean-to on the south. The kitchen was connected with the living-room by a panel door. There were two windows in the bedroom upstairs, one on the east end and the other on the west, both being of the same dimensions, twenty-four inches by fifty-four inches, the west window being located directly over the stairway. Such east window was almost directly over a similar window in the living-room. Hog wire was attached to the east side of the house up to the second story window and had been there in place for a long while, used for the

training of vines. The dimensions of the kitchen were east to west nineteen feet three inches and north to south eleven feet nine inches. In the southwest corner of the kitchen the pantry was located, a room four feet nine inches long by six feet seven inches in width. The range for cooking purposes was in the kitchen at the northeast corner of the pantry, and the nearest point of such range from the door leading into the living-room was seven feet three inches. To the southeast corner of the kitchen there was a dining-table and a bench, used to sit at the table when eating. Immediately to the rear of the range, to the west and north of the pantry, was a cupboard in the kitchen, and by it to the north, on the west side of the kitchen, there was a wash-bench. On the wash-bench was a one-gallon coal-oil can, partially filled, used to kindle fires and fill the lamps. It was in the place where generally kept. There was an oil lamp on the kitchen-table. The east second-story bedroom window was twelve feet two inches from the ground. Several matches were found strewn over the top of the range. The defendant usually slept alone in a bed in the second-story bedroom, located in the southeast corner of the room, farthest removed from the top of the stairway. Not infrequently he would take the youngest child, Calvin, to bed with him, although most of the time Calvin would sleep downstairs with his mother. The night in question the defendant slept in the bed usually occupied by him and took Calvin to bed with him. Opal slept in a bed with Eddie on the south side of the room, just west of the bed occupied by the defendant; Gracie, Bertha and Ida occupied a bed on the north side of the room, near the top of the stairway, in the northwest corner thereof, and Chester and Roy slept in a bed in the northeast corner of the room. The bed in which the wife slept was a standard size double bed in the southeast corner of the living-room, directly across that room from the stairway entrance, a distance of eleven feet two inches, and the head of the bed nearest the door leading into

the kitchen was twenty inches. From the knob side of the stairway door to the center of the door leading to the kitchen was a distance of six feet nine inches. There was a well containing water with pump attached on the west side of the house, sixteen feet therefrom, and at a distance of thirty-one feet south of the kitchen, the root-house, facing west, was located.

The wife was insured for $1,000, and the house and contents were insured for like amount. The defendant had been negotiating with a neighbor, Looney Stockton, to buy the latter's farm adjoining that owned by the defendant, for the sum of $4,000. On the day before Mrs. Riggs' death, the defendant told Stockton he would buy the latter's farm, provided he (the defendant) could get the money, and on that day the defendant told Stockton he would endeavor to secure a loan on both places, and on the same day the defendant had spoken to S. E. Dove, a banker at Huntley, about getting the money. He also proposed trying to obtain a federal loan, and re. quested Mr. Stockton to go down to Osborn, to see Mr. Bowman about securing the amount required on the security of both farms.

The defendant and his wife had quarreled from time to time, principally over the disciplining of Opal, the oldest child, the defendant's stepdaughter.

At the time of her death, the deceased was clothed in a suit of fleece-lined cotton underwear, and over that an outing flannel nightgown, fleeced on both sides, and both garments were highly inflammable. She was found lying dead and badly burned about the body, on the bare floor of the kitchen between the cooking-stove and the dining-table. There was evidence of three quarrels between the defendant and his wife, widely separated in point of time, but only Mrs. Smith and Opal, both witnesses being hostile to the defendant, remember about any quarrel of any seriousness, and there is no evidence of any threat of any character ever being made by the defend-

ant against his wife. Neither Grace nor Chester know anything of any serious quarrels between their mother and father, and they did not seem to attach any importance to any disagreement between them. All agree that on the evening of the tragedy they were friendly and everything about the house was peaceful. There had been no quarrel between the defendant and his wife for more than a month prior to that time. After supper the evening chores were done outside of the house by the defendant, Opal and Chester. Upon the completion thereof, they all returned into the house. At that time, which was about 8 o'clock in the evening, the mother and the little child, Calvin, had retired, Calvin being in the bed in the living-room with his mother. It was the custom of the mother to retire quite early. The smaller children, as usual, undressed in the kitchen and their clothing was left there, either on the floor or on a chair, and some thereof was partially burned that night. The defendant sat by the kitchen table reading a paper, and some of the children were working at their school lessons, Grace, Chester, Bertha, Eddie and Roy being at that time attending school. Chester was working on the dining-room table at arithmetic, and was the last to go to bed that night. He retired about one-half hour later than his father—after 9 o'clock. The defendant retired about 8:30 Opal says she was asleep when her father and Chester came to bed. As was his custom, the defendant that night took his shoes off in the kitchen, and left them there before going upstairs to bed, and Chester also took off his shoes before retiring and left them in the kitchen. Chester, for the state, testified:

"Papa woke me during the night. He hollered at me and told me he believed there was smoke in the house. I don't know whether I made any reply. I was sleepy and I might have said something. I might have said I didn't believe I smelled smoke, or something like that. My father didn't immediately get up, but he didn't stay in bed very long after

that. He then said he believed there was smoke in the house and got up and went downstairs. He went down the same stairs I came up. I don't know how far down he went. I don't think he called for anyone as he went down. He didn't say anything to anybody as he was going or while he was down there at that time. He came back up and told us the house was on fire, and that we would have to get out the east window, that there was so much smoke down there we couldn't get out that way. He then opened up the window. It opens to the inside and is on hinges. He also took off the screen that was on it. During this time I got up and dressed. I didn't see Calvin around there any place upstairs after my father had told me that the house was on fire. After my father got the window open, I got down on some hogwire that was tacked up to the side of the house, to the bottom of the bedroom window. I went out of the window first and Gracie came out next. I don't remember who came out of the east window next. After I got down out of the window, I went down around back of the cellar to get the ladder. I got it and brought it around and threw it down on the side of the house, because papa told me I didn't need it. I don't know what papa was doing at that time. He was upstairs when he told me to throw the ladder down, that he didn't need it. I don't think any bedding had been thrown out; that was thrown out right after I brought the ladder out. Papa threw the bedding out. He would throw out some of the bedding and then he handed out some of the children. Gracie took them about halfway and then handed them to me until they were all taken out from upstairs. The last of the children who came out from upstairs was Opal. Papa came out next. He told me to take the bedding down to the cellar, and that was done, It was taken to the cellar for the little kids to stay on till morning. It was throwed in there and made a bed out of. After my father got out of the upstairs window he went down cellar. He just came down and asked how the little kids were

and then went back up. I don't know who was in the cellar
when my father came down. Most of the children were down
there. While my father was throwing out the bedding, besides
getting the ladder, I went around and looked in the south
window of the kitchen. When I looked in at that window, I
saw the fire. It wasn't a very large fire; it wasn't very high;
it wasn't up to the window. It wasn't very far from the
window where I was looking in—about the width of the door
into the pantry. I looked into the window just before I went
around to get the ladder. All of the articles which had been
thrown down from upstairs were carried around to the cellar
at the time my father got down. Besides bedclothing, he
throwed down the top till of his trunk. I don't know who
carried that around, but it had been carried around when my
father got down. I am sure of that. I don't know who carried
Calvin around that evening. After my father had gone down
in the cellar to oversee the bedding down of the children, he
came back and told me to go and get Mr. Moyer to come
over. I then went over to Mr. Moyer's place, which is about
a quarter of a mile east from our place. It was between five
and ten minutes after I had gotten down from upstairs that
my father told me to go over to Mr. Moyer's. It was approxi-
mately between ten and twenty minutes that it took me to go
over to Mr. Moyer's, get him and return. When we came
back, Gracie and Opal were out by the house. Just before we
got through the fence I saw my father in the road, going
south. When Mr. Moyer got to the house, he said we might
just as well try and put out the fire, and Gracie and Opal
handed him some water and he got inside the house and took
it in and put it on the fire. He used four buckets of water
in putting out the fire. They wasn't clear full. He went in
the window marked 'West living-room window' on 'State's
Exhibit C'; also marked 'Stairway window' on 'State's Ex-
hibit D.' I helped in putting out the fire. I went out to the
granary and got another bucket and pumped it full of water.
After Mr. Moyer had put out the fire, he came outside. He

came out through the window that he went in at. After Mr.
Moyer came out, we didn't do anything until papa came. It
wasn't very long before papa came back. After he came back,
we waited around a little bit, and then pretty soon he sent
me up to Stockton's. I don't think any of us entered the
house before I went to Stockton's. My father sent me to
Mr. Stockton's because he wanted him to go into Huntley
and call up the coroner. I got Mr. Stockton. We didn't re-
turn together; I came back first. When Mr. Stockton and I
came back, papa and Mr. Moyer and the rest of the children
were at our place. I don't know what was done, if anything,
after I came back. I don't know whether any of them went
into the house then. I don't know whether Mr. Moyer went
into the house. I went into the house that night, after the
fire, when Mr. Stockton was down there. I think Mr. Moyer
went in first after Mr. Stockton came, and unlocked the two
doors—east and west kitchen doors. That is the room in
which my mother was lying. I went into the room then; also
papa and Opal. I think my papa was saying: 'My God, My
God,' or something like that. I saw my mother there that
night after the fire, lying on the floor, between the stove and
table. She was dead at the time I saw her lying there. She
was burned. That is the same place where I saw the fire burn-
ing at the time I looked in at the kitchen window. After I
saw my mother lying there, dead, Mr. Moyer handed me my
shoes and I went outdoors and put them on. I spent the night
down in the cellar. The next morning I went up to Mr. Stock-
ton's and stayed until noon that day. I wasn't at home at
the time the coroner came down. I had my breakfast and
dinner that day at Mr. Stockton's. I didn't see my mother
any more after the night that I saw her there on the kitchen
floor. Mr. Stockton or Mr. Moyer didn't come down into
the cellar after I went down, after the fire was out. My
father came down there. He didn't sleep that night. He was
just around down in the cellar, and once in a while he would

ask how the little kids was. At the time that I started over to
Mr. Moyer's, my father hadn't gone to any of the windows of
the house, so far as I know, and had not attempted in any
way to rescue her. I knew at that time that my mother was
not out. The next morning after the fire I went up to Mr.
Stockton's and stayed until after dinner."

And on cross-examination he testified: "The baby Calvin
didn't always sleep downstairs with my mother. When he
didn't sleep there, he slept up with papa. This night of the
22d of March wasn't the first time that my father had taken
Calvin up to bed with him. He did that frequently. There
wasn't anything unusual in the fact that my father took his
shoes off and left them downstairs that night. That is where
he always pulled them off."

At the time when Chester was returning to the house with
Mr. Moyer, when he saw his father going down the road, it
appears that the defendant was on his way to Stockton's farm,
about one-half mile distant; that the defendant was in his
stocking feet and actually went to Mr. Stockton's, knocked on
the door and hollered, "My house is on fire," and left immedi-
ately without giving his name.

Opal's testimony respecting defendant's first waking up
and suggesting there was a fire and then going down the
stairs to the door leading into the living-room and returning
back to the bedroom upstairs, and getting the children all
out of the house through the east second-story window, is
substantially the same as Chester's. Further she testified:

"After he had gotten down on the ground, he loafed around
there a while. He didn't do anything until he sent Chester
over to Mr. Moyer's and then he busted in the window. Just
before he sent Chester over to Moyer's he went to the cellar,
to see if the children were all right and helped make a bed
down for them. Chester was around there some place. I
would judge it was about twenty minutes after my father got
down from upstairs before he started Chester over to Moyer's,
and during that time, he had just been standing around and

seeing about the children. After he had started Chester
over to Moyer's, he broke in the window with the ax that was
out by the coal pile. He didn't do that right afterward. He
never went to any of the windows to see anything about the
fire or my mother, and he never called for her while he was
standing around there during that twenty minutes. He and
I did not have any conversations there on the outside while
we were standing around, before Mr. Moyer came back, about
trying to get my mother out. I didn't say anything to him
at all about getting my mother out. I presume it was about
ten minutes after Chester had gone to Moyer's that my father
went and got the ax and broke out the window. He went to
the coal pile to get the ax. I suppose he went first right
straight to the window with the ax, I couldn't say. I don't
recall where I was at the time. It was the west window, the
stairway window, that he broke out. That window leads into
the stairway. That is the stairway up which I had gone to go
to bed that night, and the stairway down which my father
had come to look at the fire. That is the only stairway in
the house. He got inside there and called mother. He called
her 'Matic.' That is the first time that he had called her
that night. He broke the door too—the inner door, inside
the stairway. That is the door marked 'Stairway door,' on
'State's Exhibit D.' He hit that with the ax and then he
came back out. He broke the door up close to the knob. He
didn't break it clear down. He said the smoke was so dense
he couldn't go on any farther, and he just came outside and
loafed around till Mr. Moyer came. It was just a few minutes
after he broke this window out before Mr. Moyer came. He
started out, just before Mr. Moyer came, for Stockton's. He
did not make any other effort than just breaking in this
west window and that door to get my mother out. After my
father came out of that window, or about the time he came
out, he said if my mother was in there, she was dead already.
I believe that was when he made that remark. He didn't say

whether or not he would be able to get her out. I was present when Mr. Moyer and Chester came back. Mr. Moyer took and grabbed a bucket of water and went inside and poured it on the fire. Grace and Chester were there at that time. Mr. Moyer went into the house by the stairway window, the one that is broke there. That is the same window that my father had just knocked out. That leads into the stairway. He opened up the door and went through into mother's bedroom to where the fire was. He went right through what is marked 'Living-room,' on 'State's Exhibit C,' and on down into the kitchen. Grace and I drawed water for Mr. Moyer. Mr. Moyer used three buckets of water in putting out the fire. About three trips were made by Gracie and myself. Mr. Moyer didn't go out of the house during the time while he was putting out the fire, from the time he went in with the first bucket. He came to the stair door—the stair door that had been struck by my father. After Mr. Moyer had put out the fire, he came and opened up one of the doors and lit a light inside. At that time, my father was on the outside. He hadn't returned yet from Mr. Stockton's. It was just a few minutes afterwards. Mr. Moyer opened up one of the kitchen doors after he was inside of the kitchen. He opened it from the inside. That was the west door, and it is near the window that was broken out by my father. My father returned just a few minutes afterward, and Mr. Stockton was with him. Soon after that, Mr. Vandersea and Mr. Wymer came. After my father had returned, I went into the house; also Chester, Mr. Riggs and Mr. Stockton. I didn't notice what my father did at that time. He made the remark: 'My God! My God!' several times. I never noticed whether he came up to examine or look at my mother. My mother was lying between the table and stove on the floor, and she was burned from her head down to her knees, nothing but just a cinder, and from her knees on down to her feet was burned in big blisters. I didn't do anything after I went in. I wasn't in there very long,—about five minutes. Nothing took place

then, only everybody was taken out of the house and the doctor was sent for. Mr. Stockton went after the doctor. After that, I went down to the cellar, where the other children was. My father went down in the cellar then after that time. It was about ten or fifteen minutes after that that he came down. I didn't have any conversation with him down there at that time about my mother and her death. He said something about the insurance,—that he had some insurance, about a thousand dollars, and that would help out some; that it was too bad about her death. I had known prior to that time that she was insured. I don't know when Mr. Stockton came back with the doctor. I wasn't up there at that time. I didn't go back there to the kitchen that night.''

And on cross-examination she testified: ''I didn't do much of anything. I just talked to the children and looked in at the fire. I saw it was blazing up, but I didn't do anything. I never suggested to my father that he do anything, and I didn't say anything to the children about it. I wasn't excited. Nobody was much excited. Everybody was cool and calm—, not as much excited as they should have been in case of fire. I should have been more excited, as my mother was involved in the fire, but the fact remains I wasn't excited, and none of the rest of the family were excited. There wasn't very much attention paid to it at all. No, there wasn't anything else happening except that our home was burning up and my mother was burning to death. Yes, Mr. Moyer was sent for and after that, he broke in the window. All he did was to bust in the window. I never called to my mother at all.''

Mr. Moyer, Mr. Stockton, and other witnesses for the state who were there that night, testified that they smelt the odor of coal-oil, and some of the jurors who served on the first trial of the case, testified that they smelt the odor of coal-oil on the pieces of the nightgown and underwear then introduced in evidence in the trial of the case. Dr. Kettlecamp, for the defense, who was called and arrived on the scene shortly after the fire, testified, however: ''When I got there I went into

the kitchen. I found the body of Mrs. Riggs there and made a partial examination at that time. I was there about thirty minutes. I can't say that I smelled the odor of kerosene, burned kerosene at that time. The odor of burned flesh was so strong in the room and was so predominant, I don't recall having smelled kerosene.''

Several witnesses, both doctors and chemists, testified in defense that a chemical analysis of the pieces of the nightgown and underwear would demonstrate conclusively the presence of kerosene, but no evidence of any such analysis having been made was introduced either by the prosecution or the defense, and Dr. Armstrong for the defense testified: ''If I thought that there was an odor of kerosene on the body and wanted to be positive as to whether or not kerosene had been used, I would turn the clothing over to a chemist and have an analysis made. That would determine positively. I wouldn't put much reliance on my sense of smell in a case of life or death. I would say that if coal-oil had been used on this body, it could have been readily detected by the odor of the body when the autopsy was performed. Where petroleum is used upon a body and burned, the body has a characteristic odor for days, and some of the residue or burned tissues of the body could be taken to a chemist and it could be positively ascertained whether or not kerosene had been used.'' And Doctor Graham, who attended the autopsy, states positively that there was no smell of kerosene about the body. The autopsy disclosed among other things, the following: The height of the deceased was four feet eight inches. Her body was badly burned, except the lower extremities from the knees down, and a strip of skin from the seventh cervical to the third lumbar vertebra, varying from four to six inches in width. The hair was coiled at the back of the head; the hairpins were in the coil of hair. The eyelids were closed; the tongue protruded between the clenched teeth; and there was a suggestion of smoke in the lungs. Both cavities of the heart

were empty and contracted. The blood was bright red in appearance and quite fluid. The brain was very soft and friable; the calvarium was intact and did not present any signs of fracture. The aponeurosis and under surface of the scalp did not present any signs of contusion. There was a clot of burned blood in the left temporal fossa, where the outer flesh had been burned away to the temporal bone. Both cavities of the heart were empty and contracted and nothing was found pathologically in the heart, it being normal in size and shape. Dr. Allard, who performed the autopsy and the only medical witness for the state, on direct examination as to the cause of death, said: "I found the organs of the body in a normal condition. The axillary space in the body is under the arms. The seventh cervical is that portion of the back bone which is most prominent, on the ordinary individual, right at the top part of the thorax, between the shoulders. The lumbar region is the small of the back. The hair was burned away excepting the coil at the back of the head. The skin on the face and head was badly scorched. It was burned, but not burned through, except in the temporal regions, and on both sides of the head, it was burned to the bone. The ears were burned away. The teeth were locked on the tongue. There was no diseased condition in the heart. Everything was normal and there was no diseased condition anywhere that could have caused death. When I say the brain was soft and friable I mean it was easily broken. The parietal lobes of the brain are the most superior portions of the brain. By the calvarium, I mean the skull. The aponeurosis is the dense connective tissue membrane which is right over the skull. In order to put the brain in the condition found in the autopsy, it would take a considerable amount of heat. I have an opinion as to the cause of death. I believe the woman died of suffocation, while in an unconscious condition, caused by some violence. The violence was applied to her head in the left temporal region.

"Q. Doctor, can you account for a woman's body lying on the floor burning, on boards, for the deep burning in the gluteal folds, from simply the floor or boards burning on the side, the depth that you found those burns, can you account for the depth from that mere fact?

"A. No, sir.

"Q. If I would assume that coal-oil had been poured upon the body, then tell the jury whether you can account for it.

"A. I would say that such a burn would be possible. If coal-oil were poured upon a body lying upon its back, it would naturally run down in that region. I have had some experience in treating burns and have read some concerning treatment. After I made the autopsy, I went back the next day and dissected the neck. I did that because I was trying to find some signs of strangulation, to account for certain conditions found here in the lungs. I presume suffocation caused the tongue to protrude. It is caused by the person trying to get air. There would be several reasons why she couldn't get air. It might be a simple choking or something inside the throat; it might be due to some external means cutting off the supply of air, such as strangulation or holding the hand over the mouth, or something like that, or in case of fire, the smoke would cut off the supply of oxygen. There was no evidence of any physical strangulation. I examined the blood vessels in the abdomen and they were apparently normal. The bright red fluid blood was quite general through the body. The heart was contracted for the same reason that your [her] other muscles were contracted, due to heat, application of heat. The condition of the blood, as to its color, was probably due to carbon monoxide in the blood. It would have to be inhaled by the person and go through the lungs. Carbon monoxide is a chemical combination, the result of imperfect combustion. Well, for instance, in a furnace, where your coal has been smouldering, due to coal dust, there is no flame there to change your carbon monoxide to carbon dioxide and it

is heavily saturated with carbon monoxide, which is poisonous to a human being, or animals in general. I don't know if that answers your question or not. I lost track of your question. The generation of carbon monoxide gas is the combustion of material having a large amount of carbon, such as coal or oil, wood, to a less extent. I don't think that a great deal of carbon monoxide could come from the burning of mere clothing.

"Q. In order, Doctor, to have burned the head in the condition that you found it at the time, the hairs all burned off, and taking into consideration the brain in the condition in which you found it, would that ordinarily be expected from a body simply lying on the floor, from fire, the boards catching fire?

"A. No, sir. If coal-oil were used, you would have a different condition there. I couldn't find any fracture of the skull in the temporal region, but it is not necessary to have a fracture for the purpose of causing an injury which results in a blood clot. In the temporal region, everything was burned down to the skull."

Further, he testified: "The flexing of the hands and arms was due to fire, heat. I don't recall finding any soot in the lungs. The appearance of soot in the lungs is the general post mortem finding where there is suffocation from flame and smoke. I think the contracted condition of the heart was caused in the same way as the contraction of the other muscles. I believe the heat was intense enough to contract the heart. Ordinarily, where death is due from suffocation, or from any form of asphyxia, the cavities of the heart are congested and full of blood, especially on the right side, and this blood is dark blood. The only reason I have for saying now why the heart was in the condition in which it was found is the heat; also because I believe that carbon monoxide poisoning was experienced. The blood is often bright red from burns of any character. I don't know whether you find it that way when

there is no carbon monoxide present. I wouldn't want to say whether it might not be bright red' without carbon monoxide. I don't know.''

And he admitted that at the former trial he said: "That death resulted here likely from some violence, such as a blow on the side of the head in the region of the left temporal bone, and that following this, either from direct strangulation or strangulation from smoke, the death resulted.'' He also admitted that at the coroner's inquest he testified: "That death was caused by the inhalation of some very heavy irritant volatile gas.'' Further he admitted that he stated to counsel for the defendant and to several physicians, that there was no sign of physical violence upon the body of the deceased, and he does not deny that he told Doctors Armstrong, Barrett and Graham, just a few days before the first trial and some months after the autopsy, that he had no idea what caused the woman's death except burning. All of the doctors mentioned gave testimony for the defense to the effect that Dr. Allard had made substantially such statement to them.

The evidence on the part of the defendant as to the cause of death was given by Doctors Armstrong, Barrett, Wernham and Graham, the last named of whom helped perform the autopsy. All four of these witnesses expressed opinion that the cause of death was due to burning, and it is noteworthy, that although the names of Doctors Graham and Barrett were indorsed on the information as witnesses for the state, they were not called by the prosecution. They all testified that the burning could reasonably have been accidental. On this subject Doctor Armstrong testified:

"Q. Assuming, Doctor, that the following facts exist and are true, and they be so found by the jury in this case, to-wit, that the body of a well-developed female is found on the kitchen floor of her home, with the head, face, neck, thorax and abdomen badly charred from burning, that the said adult female, at the time of such burning, and of her death, was

clothed in a suit of underwear, the same being fleece lined, and over said suit of underwear she had on an outing flannel nightgown, and that said clothing, or especially the outing flannel nightgown, is highly inflammable, could death have reasonably occurred if such clothing had caught fire accidentally and from the fire so caused alone?

"A. Yes, I think so. Death was sudden and came from a shock caused by the burns. I would consider that she breathed just a few seconds. I can't discover any other reasonable cause of death except one due to shock. The contracted heart indicates that death was due to shock, and the lungs being only slightly congested would indicate that. If the deceased had lived for an appreciable length of time, there would have been a strong odor of smoke in the lungs and the air tract would have been intensely congested and full of mucus and it would have been sooty."

Dr. Barrett, answering the same question, testified: "Yes, sir. Considering the findings as detailed in the hypothetical question, I would say the person lived a very short time. What I mean by 'short time' is that death, for all practical purposes, was almost instantaneous."

Dr. Wernham, answering the question, testified: "Yes, sir."

And Dr. Graham, testifying of his own knowledge, said: "Knowing how she was clothed, I would say that if she had caught fire accidentally, death could have occurred from the catching afire alone, and without any other cause."

The state's theory is that the deceased was unconscious at the time she was burned; that that unconsciousness was brought about by a criminal act and that act was the act of the defendant. It was thought the deceased was chloroformed and then placed upon the kitchen floor, and that idea apparently prevailed with the state until the report made by the chemist at Bozeman. But how did the deceased become unconscious? She must have been unconscious or the state had no case, for the body was still intact when found and an

autopsy had been performed. She certainly would not allow the defendant to burn her if she had her senses. It was beyond the range of probability that she lay down and then touched a match to her own garments. Whether conscious or unconscious, she would have writhed from pain when the fire struck her body. There had to be a state of unconsciousness or there was no case. However, the evidence shows that Dr. Allard, at the autopsy and afterward, had told a number of people, including members of his own profession, that *"there was no sign of physical violence upon the body, and that he could not account for the death of the deceased except by burning."* At the trial he spoke of strangulation, but admitted that there was no evidence of direct strangulation. At first he said that death was due to the inhalation of some very heavy irritant volatile gas. This was at the time of the autopsy. He said nothing then of physical injury. He had just examined the body; everything was fresh in his mind. After that, all would be memory. The conversation with the doctors took place two months after the autopsy, and just before the other trial. Yet he said nothing to them of a blood clot or of strangulation, or anything that would indicate that he had an idea as to how the woman met her death. He admitted that at the time of the autopsy he paid no attention to the blood clot. Further, Dr. Armstrong said that he talked with Dr. Allard a great many times concerning the matter, between the autopsy and the ninth day of May, 1918, and that Allard never said anything concerning a blood clot. At the former trial, apparently it was not clearly brought out as to the kind of clot this was, but on the second trial, it clearly appears that it was not a blood clot typical of violence. Even Allard admits this, and Graham, who was present and helped perform the autopsy, says that it was not a typical blood clot indicating violence, and that he thought it was simply a little clot caused by the heat.

As derived from the opinion of expert witnesses, there were a number of features which seemed to negative the theory of the state as to defendant's guilt, for instance: There was just a trace of smoke in the lungs, the heart was contracted and there was no coagulated blood therein, the blood in the body was red and fluid. It would appear as though the deceased just gasped and fell over dead. She didn't move; the eyelids were closed; the tongue was protruding; she caught the tongue between the teeth as she gasped. There was only one other way for the tongue to get out in the manner indicated and that was by strangulation, and from the evidence there was no strangulation in this case. The contracted heart was admitted by all to mean death by shock. Had she been knocked unconscious, she would have moved violently when fire was applied to her body until she died, and her tongue would have fallen back in the mouth rather than protruded. Then there was a box of matches tipped over on the stove as though a hand had reached out in the dark and spilled them. Monoxide gas could not easily have been produced under the conditions, and at any rate not in sufficient quantity to produce death. If she were dead when the fire started, she could not have inhaled any gas, for there was neither respiration to carry the gas into the body nor circulation to carry it through the body. If the defendant was guilty of violence on the person of the deceased, when and where did he administer it?

The state rested its case on the assumption that a blow was administered to the deceased in the region of the middle fossa, on the left side. There was no fracture of the skull there; there was no rupture of the meningeal artery and it is not disputed—the state having put in no rebuttal—that there could not, in all probability, be a blood clot in that position produced by a blow in that vicinity unless the skull had been fractured, and there positively could not be a clot unless the artery, or some of its branches, had been ruptured.

There is no evidence to show, in any way, that a blow was administered to the deceased. No instrument was found with which such a blow might have been delivered; no evidence of injury to the defendant's hands; no fracture of the skull, and not even a contusion of the scalp. The eyes were normal, the pupils evenly dilated, and the clot itself does not indicate violence. Moreover, the testimony of the witness Maddox is undisputed. That witness says it is not probable that the defendant could have struck the deceased with his fist and caused unconsciousness, but that if he did hit her so powerful a blow on the bony structure of the skull, there would be an injury to his hand which would be noticeable.

The autopsy shows "there is a clot of burned blood in the left temporal fossa, where the outer flesh has been burned away to the temporal bone." This we now know is untrue, the witness Allard admitting that it is not a statement of the facts. He and Dr. Graham and a witness named Schlosser all say that there was a little frothy, bubbly clot, about as big as a dime or a nickel, on the inside of the skull, and Dr. Allard said: *"If she fell, and fell on the back of her head, a clot of blood might have been produced anywhere in the front of the head. I don't know whether the blow was struck in the immediate vicinity of the middle fossa or not. If the blood vessels in that vicinity are ruptured, the skull is usually fractured, and I could not find any fracture here."*

Further, he stated: "In order to have a blood clot there, there would have to be a rupture of a blood vessel in that region. There could not be a clot there without a rupture of the artery or some of the veins in that vicinity. I did not find any rupture of the artery. * * * It was not a normal clot, such as you would expect." And again, he stated: *"The clot probably produced unconsciousness."*

There is no testimony even touching a criminal agency in this case, other than that of Dr. Allard. Without a state of unconsciousness produced by a criminal agency, there is no

evidence whatever upon which a conviction can stand. Yet, there is no evidence in the record that the supposed clot on the inside of the skull of the deceased produced unconsciousness. This witness said: *"Probably."* Moreover, the medical witnesses for the defense all state, in their judgment, that even though there was a clot of this character, it probably would not produce unconsciousness.

In view of this, what reliance can be placed on Dr. Allard's testimony, that there was violence applied in the region of the middle fossa? Not only would reasonable men be in doubt as to a state of unconsciousness, but if they had to decide upon such evidence, they would have to come to the conclusion that there was not a state of unconsciousness. This, however, is simply from the state's evidence alone. Doctors Armstrong, Barrett, Wernham and Graham all testify that if the deceased had been unconscious, she would have moved violently upon the floor until death came, and they give their reasons for such belief, and those reasons are sound and irrefutable, and they gave illustrations from their own practice where one who is unconscious responds immediately to pain, and all testify that it is only a state where an anesthetic is given that the person would not respond to pain. Moreover, the state's evidence shows conclusively that the deceased did not move from where she lay on the floor, after getting there. She was not unconscious, but dead, immediately after her body came in contact with the floor.

The fact that the defendant did not make more of an effort to save his wife creates only a suspicion, and that is overcome by his sending Chester to Moyer's for aid; by his breaking into the window of the house and attempting to make an entry and calling to his wife; by his going to Stockton's for assistance; by reason of the fact that the deceased was on the bare floor of the kitchen and not in bed; by his telegraphing to her mother and sending for a doctor and the coroner; and the further fact that he did nothing to accelerate the fire

so as to cover the crime, were he guilty of crime. It may also well be remarked, it is surprising and beyond comprehension, why Opal and the others over the age of discretion, paid so little attention to their mother, under the circumstances. This is the great mystery. None of them thought of mother. No explanation is made or attempted to be made in the evidence; we can make none.

Men do not ordinarily call witnesses to the result of their criminal acts. "His conduct in leaving his wife in an adjoining building and running away to alarm the neighborhood may not unfairly be attributed to his lack of moral fibre or physical courage in the abject fear which overcame him when he discovered that the fire could not be extinguished." (*State* v. *Bass*, 251 Mo. 107, 157 S. W. 782.)

If a conviction may be had upon inferences or conjectures, then why is Opal not equally as guilty as her stepfather? Her conduct the night of the fire is just as unexplainable as his, and her opportunity for commission of the crime just as favorable. Admittedly she expressed no anxiety or concern for her mother, while though belated, he did in fact try to enter the house and called to his wife. The strange thing is that none of the children, young or old, seemed to have any thought or care for their mother at the time of the conflagration, although it appears that she was a good mother to them. The entire case is shrouded in mystery and the conduct of the father and all of the children seems most unnatural.

We are committed to the doctrine that "a defendant may [2] not be convicted on conjecture, however shrewd, on suspicion, however justified, on probability, however strong, but only upon evidence which establishes his guilt beyond a reasonable doubt; that is upon proof such as to logically compel the conviction that the charge is true." (*State* v. *McCarthy*, 36 Mont. 226, 92 Pac. 521; *State* v. *Postal Tel. Co.*, 53 Mont. 104, 161 Pac. 953; *State* v. *Taylor*, 51 Mont. 387, 153 Pac. 275; *State* v. *Sieff*, 54 Mont. 165, 168 Pac. 524; *State* v. *Mullins*,

55 Mont. 95, 173 Pac. 788; *State* v. *Brower,* 55 Mont. 349, 177 Pac. 241; *State* v. *Riggs, supra; State* v. *Schrack,* 60 Mont. 70, 198 Pac. 137; *People* v. *Ahrling,* 279 Ill. 70, 116 N. E. 764.)

Our statute, section 8298 of the Revised Codes, provides: **[3]** "No person can be convicted of murder or manslaughter unless the death of the person alleged to have been killed and the fact of the killing by the defendant as alleged, are established as independent acts; the former by direct proof and the latter beyond a reasonable doubt." In construing this statute, this court has held, and it is our view, that in prosecutions for murder, proof of the *corpus delicti* involves the establishment of the fact that a murder has been committed, but it proves neither the identity of the person alleged to have been killed, nor the killing by the person accused. (*State* v. *Calder,* 23 Mont. 504, 59 Pac. 903; *State* v. *Nordall,* 38 Mont. 327, 99 Pac. 960; *State* v. *Pepo,* 23 Mont. 473, 59 Pac. 721.)

The general rule in homicide is that the criminal agency— **[4, 5]** cause of the death,—may always be shown by circumstantial evidence. But in order to sustain a conviction, proof of the criminal agency is as indispensable as the proof of death. The fact of death is not sufficient; it must affirmatively appear that the death was not accidental; that it was not due to natural causes, and that it was due to the act of the defendant. Where it is shown by the evidence on one side, as in the case under consideration, that death may have been accidental, or it may have been the result of natural causes, or due to suicide, and on the other side that it was through criminal agency, a conviction cannot be sustained. Proof of death cannot rest in the disjunctive. It must affirmatively appear that death resulted from criminal agency. (1 Wharton's Criminal Evidence, 10th ed., p. 649.)

The court in Instruction No. 29 correctly told the jury they "should be convinced by the evidence beyond a reasonable doubt of the criminal agency involved in the commission of

the crime charged; that is, of the manner in which the death of the deceased was accomplished.'' The evidence falls far short of meeting the requirements of this instruction as to the law, in that it does not appear as to how the death of the deceased was accomplished. And where the circumstances [6] relied on to prove that death was caused by the criminal act of a person, other than the deceased, are consistent with the theory that death was produced by natural causes, there is failure of proof. (*Dreessen* v. *State,* 38 Neb. 375, 56 N. W. 1024.)

Where an act may be attributed to a criminal or an inno- [7] cent cause, it will be attributed to the innocent cause rather than the criminal one. (*People* v. *Ahrling,* 279 Ill. 70, 116 N. E. 764.)

The evidence is entirely circumstantial, and in our opinion is not adequate to support the verdict, the testimony not being sufficiently strong and convincing to exclude every rational hypothesis other than the defendant's guilt.

Section 7853 of the Revised Codes provides as follows: "Indirect evidence is that which tends to establish the fact in dispute by proving another, and which though true, does not of itself conclusively establish the fact, but which affords an inference or presumption of its existence. For example, a witness proves an admission of the party to the fact in dispute. This proves a fact from which the fact in dispute is inferred."

Direct evidence differs from circumstantial, in this, that in the former witnesses testify directly of their own knowledge of the main fact or facts to be proven; while the latter is the proof [8] of certain facts and circumstances in a given case, from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind: *State* v. *Avery,* 113 Mo. 475, 21 S. W. 193; or, as it is stated in *Beason* v. *State,* 43 Tex. Cr. App. 442, 69 L. R. A. 193, 67 S. W. 96: "The distinction between circum-

stantial evidence and direct evidence is that in the first instance the facts apply directly to the *factum probandum,* while circumstantial evidence is proof of a minor fact, which, by indirection, logically and rationally demonstrates the *factum probandum.*"

Circumstantial evidence is divided into two classes: (1) Certain, or that from which the conclusion necessarily follows: and (2) Uncertain, or that from which the conclusion does not necessarily follow, but is probable only, and is obtained by process of reasoning. (Greenleaf on Evidence, 14th ed., sec. 13a; *Gannon* v. *People,* 127 Ill. 507, 11 Am. St Rep. 147, 21 N. E. 525.)

The relative advantages of circumstantial and direct testimony are pointed out by Chief Justice Shaw in the leading case of *Commonwealth* v. *Webster,* 59 Mass. (5 Cush.) 295, 52 Am. Dec. 711, in the following words: "Each of these modes of proof has its advantages and disadvantages; it is not easy to compare their relative value. The advantage of positive evidence is, that it is the direct testimony of a witness to the fact to be proved, who, if he speaks the truth, saw it done; and the only question is, whether he is entitled to belief. The disadvantage is, that the witness may be false and corrupt, and that the case may not afford the means of detecting his falsehood."

The court then discussed circumstantial evidence, saying: "The advantages are, that, as the evidence commonly comes from several witnesses and different sources, a chain of circumstances is less likely to be falsely prepared and arranged, and falsehood and perjury are more likely to be detected and fail of their purpose. The disadvantages are, that a jury has not only to weigh the evidence of facts, but to draw just conclusions from them; in doing which, they may be led by prejudice or partiality, or by want of due deliberation and sobriety of judgment, to make hasty and false deductions, a

source of error not existing in the consideration of positive evidence.''

While all evidence is more or less circumstantial, there is a difference between facts of a particular nature, giving rise to presumptions, and evidence which is direct consisting in the positive testimony of witnesses, to events and occurrences, and the difference is material according to the degree of exactness, the relevancy, weight of circumstances, and the credibility of the witnesses.

But where a conviction is sought solely upon circumstantial [9] evidence, the criminatory circumstances proved must be consistent with each other and point so clearly to the guilt of the accused as to be inconsistent with any other rational hypothesis. (*State* v. *Woods,* 54 Mont. 193, 169 Pac. 39; *State* v. *Suitor,* 43 Mont. 31, 114 Pac. 112; *State* v. *Slothower,* 56 Mont. 230, 182 Pac. 270; *People* v. *Ahrling, supra.*)

The nature of circumstantial evidence being such that a certain conclusion or state of facts is sought to be inferred from the establishment of other facts, it is necessary, not only that the guilt of the accused be consistent with those facts, but they must exclude every reasonable hypothesis other than his guilt; or as it is sometimes expressed, they must be susceptible of explanation upon no reasonable hypothesis consistent with the innocence of the accused. The reason for this is, that as long as the circumstances are capable of two or more explanations, one consistent, and the other inconsistent with his innocence, the evidence does not fill the test of moral certainty, and is therefore insufficient to convict.

The same degree of certainty is required to warrant a [10] conviction on circumstantial evidence as when the evidence is direct, and the jury are required in all criminal cases to be satisfied beyond a reasonable doubt of the guilt of defendant. (*State* v. *Ryan,* 12 Mont. 297, 30 Pac. 78.)

In the decision on the former appeal of this case, Mr. Justice Holloway well said: ''The evidence is not only intrinsically

deficient, but its legal insufficiency is emphasized by the facts which it fails to prove or tends to prove. So far as disclosed by the record, the theory upon which the state proceeded was that Mrs. Riggs had been dealt a violent blow on the side of the head sufficient to render her unconscious; that her body was then moved from the front room, where she had been sleeping, to the kitchen, laid upon the floor, her clothing saturated with kerosene, a fire started, and that she was suffocated by the smoke. There is not even a scintilla of evidence to support any other theory. There is not any evidence of a telltale bludgeon with which the blow was struck; no evidence that defendant's hand showed signs that he had struck her with his fist; no evidence of blood or the odor of kerosene on his clothing; no evidence of a struggle or outcry; no evidence of any motive on the part of the defendant. There was no contusion on the head of the deceased and no evidence upon the undersurface of the scalp that a blow had been administered. Although defendant slept in the second-story bedroom with eight children, including Opal, the stepdaughter, aged eighteen, and a witness most unfriendly to defendant, there is not a suggestion that anyone heard him leave his bed or the room from the time he retired at 8:30 until the fire was discovered.

"The evidence does not exclude the theory of accidental burning and death from shock. Granting, for the sake of argument, that the facts and circumstances raise conjectures, suspicions and probabilities inconsistent with the theory of defendant's innocence—and I insist that they do not do more— * * * .

"The verdict in this case can rest only upon mere suspicion born and nurtured in the abhorrence which the jury must have felt for a man so brutal in his conduct toward his wife and so cowardly that he would not incur greater risk to save her from their burning house."

The evidence is wholly insufficient, not only to fix the crime upon the defendant, but to show beyond a reasonable

doubt that there was a criminal agency employed. It amounts to no evidence at all.

We are not unmindful that we are limited on our review to an examination of the record to determine whether there is any substantial evidence to justify the verdict. (*State* v. *Popa*, 56 Mont. 587, 185 Pac. 1114.) But where the evidence [11] is unsubstantial, or is wholly lacking in material particulars, or where it is meager, fragmentary, disconnected and speculative, as in this case, it is insufficient; and when a conviction results, based on such testimony, this court will not hesitate to set aside the verdict. In our opinion the verdict in this case was the result of passion and prejudice, aroused by that which the defendant did not do, rather than what he did do, on the night of the tragedy, the wanton disregard of the defendant for the safety of his wife under the circumstances. It is far better that a guilty man should go unpunished, than that an innocent person suffer punishment based on such evidence.

For the reasons stated the cause is reversed and remanded, and it is ordered that the case be dismissed and the defendant discharged.

*Reversed.*

Associate Justices Cooper and Holloway concur.

Mr. Chief Justice Brantly and Associate Justice Reynolds: The evidence is unsatisfactory, so much so that as members of the jury to which it was submitted, we should have been unwilling to agree to a verdict of guilty. Even so, the legitimate function of this court is that of review to ascertain whether the evidence as it appears in the dead record is sufficient to furnish a substantial basis for an inference of guilt and not to determine its weight. This is exclusively the function of the jury.

After an examination of the evidence, due allowance being made for the fact that the jury observed the witnesses and

heard them testify, we are impelled to the conclusion that the verdict should not be disturbed. There is substantial evidence, the probative value and force of which has not, in our opinion, been taken into account by the majority of the court. It seems to us that this, taken together with all the other evidence, tends to establish, to the exclusion of every other rational hypothesis, not only that the decedent was killed by violent means, but also that she was killed by the defendant.

It will serve no useful purpose to set out and analyze the evidence. We are content, therefore, to go no further than to record our dissent.