STATE, RESPONDENT, *v.* FOUNTAIN, APPELLANT.

(No. 4,888.)

(Submitted October 29, 1921.  Decided December 5, 1921.)

[203 Pac. 355.]

*Criminal Law—Homicide—Evidence—Motive — Circumstantial Evidence—Sufficiency—New Trial — Newly Discovered Evidence—Lack of Diligence—Homicide—Motive—Evidence—Admissibility.*

Homicide—Motive—Evidence—Admissibility.
    1. In a prosecution for homicide, evidence of a robbery for participation in which deceased, a deputy sheriff, was attempting to arrest defendant was properly admitted for the purpose of showing motive to commit the crime for which defendant was on trial.

Same—Circumstantial Evidence—Sufficiency.
    2. Evidence, circumstantial in character, *held* sufficient to warrant conviction of murder in the second degree, under the rule that where conviction is sought solely upon circumstantial evidence, the criminatory circumstances proved must be consistent with each other and point so clearly to the guilt of the accused as to be inconsistent with any other rational hypothesis.

Same—New Trial—Newly Discovered Evidence—Lack of Diligence.
    3. Where during the trial counsel for defendant cross-examined witnesses for the state with reference to the question whether certain marks claimed by the state to have been made by bullets were not made by blasting a beaver dam, an affidavit, on motion for new trial on the ground of newly discovered evidence, that the dam had been blasted shortly after the shooting occurred disclosed lack of diligence to discover the facts and was insufficient to warrant a retrial.

*Appeals from District Court, Powell County; George B. Winston, Judge.*

WILLIAM FOUNTAIN was convicted of murder in the second degree, and appeals from the judgment of conviction and from an order denying a new trial.  Affirmed.

*Mr. I. R. Blaisdell*, for Appellant, submitted a brief and argued the cause orally.

1. Admissibility of evidence tending to prove other crimes is order to show motive for homicide, see notes in 7 Ann. Cas. 67; 62 L. R. A. 200.
    2. Admissibility and sufficiency of circumstantial evidence, see notes in 62 Am. Dec. 179; 97 Am. St. Rep. 771; Ann. Cas. 1913E, 428.

*Mr. Wellington D. Rankin,* Attorney General, and *Mr. L. A. Foot,* Assistant Attorney General, submitted a brief; *Mr. Foot* argued the cause orally.

MR. COMMISSIONER JACKSON prepared the opinion for the court.

William Fountain was convicted of murder in the second degree for the killing of George Warburton, under-sheriff of Powell county, and sentenced to a term in the state penitentiary of not less than twenty nor more than forty years. From the judgment and an order denying a new trial defendant appeals.

It appears that on April 4, 1920, defendant and a companion named Bartrow, an escaped convict from the penitentiary, Huntsville, Texas, left Chicago and started west. They paid their fare as far as Jamestown, North Dakota, where a series of crimes was begun. The room they occupied in Jamestown was burglarized, an unoccupied house rifled, and two men who had given them a lift in a Studebaker car were compelled, at the points of Bartrow's and Fountain's guns, to teach the former how to run the machine, were then robbed and turned out on the road; the two bandits driving in the car until they disabled it. They reached Helena on April 18, 1920, and walked from there along the state road until they came to the home of one C. A. Olson, near Blossburg. They had supper and slept there that night, and· after breakfast on the morning of the 19th repaid the hospitality of Olson by holding him up and taking everything of value there was in his cabin. Bartrow stepped up behind the old man and ordered him to throw up his hands, firing one shot alongside his foot. At the word of Bartrow the defendant trained his 22-caliber rifle on Olson and kept it there while the other ransacked the house. After they had collected the spoils, which included a 44-caliber rifle and a double-barreled shotgun, both of which they compelled Olson to clean and oil, inside and out, according to Olson's testimony, they had a

discussion over the sum of fifty cents which defendant declared was owed to him by Bartrow. Bartrow paid over the money. Then defendant went over the goods of Olson that Bartrow had collected. After compelling Olson to put them up a lunch, they departed, going toward the west.

Early that afternoon, the defendant appeared at the railroad station at Blossburg and inquired of the agent Lyle concerning west-bound trains. He had no firearms visible on his person. About three-quarters of an hour later, Olson complained to Lyle of the holdup and the latter called the agent at Elliston and told him the robbers were walking toward that place. When Lyle heard the under-sheriff was on his way from Elliston to apprehend the men, he took a rifle and hurried down the track to meet him. As he rounded the curve between Blossburg and the spot where Warburton was killed, he thought he saw two men on the railroad track, but was not sure. He then came up where the wounded under-sheriff was lying, down from and south of the railroad-bed, and submerged to his waist in water. He asked him if his name was George Warburton and was answered in the affirmative; and when asked "if those fellows shot him," Warburton mumbled, "Yes." Lyle opened the coat and vest of the prone man, but could find no wound. He did not move him, but went back to a semaphore which stood 300 or 400 feet east of where Warburton was lying, to flag an east-bound freight train he knew was coming. When the train arrived, Lyle and the crew drew Warburton from the water and placed him in the caboose. They found he had been shot once in the abdomen just below the waistline and once in each leg. His badge, gun, and valuables were gone from his person, and he died without recovering consciousness, on the way to Helena.

The autopsy showed the following, omitting the sutured incised wound in the axilla, or armpit, which was made by the undertaker in embalming the body: A slight abrasion of the skin in the nipple line just below the right costal margin; a slight abrasion of the skin on the right side of the forehead

and in the scalp in the parietal region; a round puncture wound in the abdomen in the interspinous line, two inches to the left of the midline measuring five-sixteenths by six-sixteenths inches; in the left leg a wound of entrance at the level of the upper border of the knee-cap, and one-half inch inside, and a wound of exit one inch below and internal to the wound of entrance, the tract of the wound being just beneath the skin; in the right leg a wound six inches below the patella and one inch lateral to the tibia, measuring three-eighths by five-eighths inches, pointed at the lower end; one and one-half inches and below and lateral to this wound in the right leg, another wound measuring three-eighths by five-eighths inches, which is oval, a tract of two of one-half inches beneath the skin connecting the two wounds; a puncture wound of the left buttock two and one-half inches below the posterior superior spine of the ilium, this being the wound of exit connected with the abdominal puncture.

That afternoon Warburton had boarded the head engine of an east-bound freight train at Elliston, going toward Blossburg, to apprehend Bartrow and Fountain for the robbery of Olson. As the train approached the semaphore near milepost 23, two men were observed by the occupants of the engine walking west on the south side of the tracks. One was taller than the other, and they were carrying a suitcase, a shotgun case, and two rifles. As the head engine passed them, Warburton dropped off on the north side of the track and walked west. He was observed by the fireman of the helper engine on the rear of the train to have nothing in his hands. The head brakeman of the train, who rode in the cab of the forward engine, looked back at the two men walking on the south side of the track. When they had reached the semaphore he observed the smaller begin to sit down, start up quickly, and follow his companion. The engine then going around the curve, his line of vision was cut off. Some time between 3:30 and 4 o'clock, and after Warburton was shot, defendant and Bartrow appeared at the ranch house of one Richard, near

Rich Spur, not far from the scene of the shooting. Bartrow had a long wound in the left upper arm and shoulder, which he wanted dressed. The defendant told there that he and "his buddy" were hunting and that he "shot his buddy." Bartrow had a six-shooter half concealed by his trousers, and also the 44-caliber rifle. The defendant was carrying a gun case and had an overcoat on his arm. His undercoat was buttoned and he had not the 22-caliber rifle. About 4 o'clock the foreman of the Elliston Line Company, who had been told of the killing of Warburton and to be on the lookout, saw two men who had left the railroad track and were going due north. He notified Elliston and shortly afterwards a posse from there joined some men of his. The posse called upon the two men to surrender. Not heeding the calls, fire was opened on them, and one, Bartrow, fell, shot through the hips, and the other, Fountain, putting up both hands, came down the hill and surrendered. Warburton's gun, a 32/20, his belt and scabbard, were strapped around defendant's waist, and in his pockets were found many of the articles stolen from Olson. Bartrow died on the way to Deer Lodge, without speaking.

From one of the pockets of Bartrow's trousers, which showed no sign of a bullet hole, among other things were taken three bent silver dollars, which fitted together. Warburton's custom was to carry silver coins in his lower right vest pocket, and defendant says the three silver dollars came from Warburton's person; that Bartrow told him they came from his vest. In examining Warburton's vest, the coroner found in the lower right vest pocket a bullet hole, and a 32/20 bullet that fitted into the bent dollars when put together fell out. No gun of such caliber was in possession of any of the three men, save Warburton.

The railroad tracks from the semaphore run, roughly speaking, east and east. On the south side of the tracks, practically all of the distance to beyond where Warburton was found, there is willow brush, and there was then much water. The

ground was covered with a soft, slushy snow. The willows were sparse in the immediate vicinity of Warburton, but some distance south of him they were quite thick and rose to a height of from eight to ten feet. Between Warburton and a point in the dense, high willows, 200 feet south, where a wet mackinaw belonging to Bartrow was found, there were deep water and a beaver dam. A track of footprints led from Warburton's position through the willows, water, and beaver dam to where the mackinaw was discovered, and there the willows were pounded down and several bore bullet marks. The footprints continued on to and down the country road for about 100 feet, where they entered the creek and were lost to view. Both Bartrow and Fountain were quite wet when captured.

Although the 44-caliber rifle had not been shot by anyone after the arrest of defendant, and although it had been cleaned by Olson prior to having been taken by the defendants, yet it showed unmistakable signs of burned powder in the barrel. The barrel of the 22 was also found to have burned powder particles in it. This latter gun was discovered, stock and barrel some distance apart, north of the track near Rich Spur.

Defendant predicates error in the giving and refusing of instructions, admission and exclusion of evidence, and complains of the sufficiency of the evidence to support the verdict. The jury was properly instructed, and the rulings of the court admitting and excluding evidence were correct.

The testimony which proved the robbing of Olson was ad-
[1]   mitted solely for the purpose of showing motive to commit the crime of murder, and the jury was exhaustively and cautiously instructed on this point. "Such evidence goes to the jury as a matter of necessity, for the purpose alone of showing motive on the part of the accused to commit crime, and no more than is necessary to show motive should be allowed, and then the jury told the purpose for which the evidence is to be considered by them." (*State* v. *Geddes,* 22 Mont. 68,

[61 Mont. 461.]

91, 55 Pac. 927, quoting *Martin* v. *Commonwealth*, 93 Ky. 189, 19 S. W. 580.)

No known person now alive was present at the actual killing of Warburton save the defendant, and the evidence on this point for the state is entirely circumstantial. The defendant took the stand on his own behalf. Although prior to the trial he declared he was eighteen years of age, he stated he was but sixteen when on the stand. He admitted the various depredations prior to the killing, but sought to escape culpability on the score that he was under the domination of Bartrow, was afraid of him, and could not get away from him. He stated he met Bartrow in Chicago Heights, where defendant lived with his mother. Under what circumstances they met is not shown. Shortly after making his acquaintance, they came west to trap. A natural inquiry is here pertinent as to how a youth of such tender years, and previously good character as was testified to in his behalf, became thrown in with an escaped convict. The escaped convict knows he is a pariah and his habitat is in the depths of the underworld. The defendant went into detail of the holding up of the automobile, in which he took part, and likewise admitted the Olson robbery.

Defendant's story of the tragedy is that he and his companion had been passed by two freight trains; that Bartrow was ahead of him a few paces as the second one was passing, and as he started to sit down on the base of the semaphore Bartrow said that they did not have much time, so he arose and followed him. He denies that he looked under the train or that he saw Warburton until the latter came around the end of the train and told him and his companion they were under arrest.

As Warburton came into view, defendant says he walked between defendant and Bartrow, searched the defendant for arms, told him to drop his guns, and then pursued Bartrow, who had a 44-rifle in his hands and a six-shooter on his person, down the track to the spot where Warburton was killed.

[61 Mont. 461.]

Bartrow and the under-sheriff engaged in a pistol duel there and Warburton fell. After Warburton had . fallen, Bartrow dropped, picked himself up, climbed the fence on the right of way, and went south through the brush over to the county road. Defendant says he remained standing where he was, and, when called by Bartrow, started to cross to him, but fell in a deep hole of water and turned back again to the tracks and that then Bartrow came back to the body of Warburton and defendant walked down to that point. He says Bartrow robbed the dying man and told defendant to wear the belt, gun and scabbard taken from him. Then they went to the Richard place. He told a false story of the killing there, he says, because he was afraid of his companion. For the same reason he threw away the 22-rifle.

In the case of *State* v. *Riggs,* 61 Mont. 25, 201 Pac. 272, the [2] last word on the law of circumstantial evidence in this state is succinctly laid down by Mr. Justice Galen, when he states: ''Where a conviction is sought solely upon circumstantial evidence, the criminatory circumstances proved must be consistent with each other, and point so clearly to the guilt of the accused as to be inconsistent with any other rational hypothesis.'' In the instant case, while the details of the tragedy itself, from the viewpoint of the state, are circumstantial, nevertheless the entire case is not confined solely to circumstantial evidence. The defendant admitted being ''the buddy'' of Bartrow and a party to several crimes prior to the killing. While he professed fear of Bartrow, his evidence showed that on many occasions he had ample opportunity to either escape from the man or notify the authorities concerning his character. He carried firearms to the scene of the tragedy. He told a lying tale concerning the wounding of his companion. He was in flight, escaping to the hills, when caught. He had on his person Warburton's belt, scabbard and gun. Warburton had been shot at with this very weapon, as shown by the silver dollars and the 32/20 bullet that fell from Warburton's vest. Immediately after he was captured,

defendant denied having had any part in the Olson robbery, saying he did not even have a gun. He denied that the 44-rifle had been shot at all while in the possession of himself and companion, and at the trial stated that Olson had not cleaned the rifle on the inside. But in a prior statement he declared that Olson had cleaned the gun with a ramrod.

Much stress is laid on the size of the wounds by counsel for defendant, who contends that these "dumb mouths" show his client's innocence. Dr. Woodward testified that from a comparison of the size of the wound in the right leg and the other ones in the body, in his opinion, two guns of different caliber were used. Dr. Marquette, a witness for the defense, stated that the wounds in the legs were large enough to have been made by a 44-caliber missile. This evidence was certainly sufficient for the jury as to whether or not one or two men were shooting at Warburton. And if it be argued that Bartrow emptied his six-shooter and then shot the rifle, or *vice versa*, why a positive denial on the part of the defendant that the 44 was shot at all? While defendant's memory is clear and accurate in relating his story, his mind is a wondrous blank with respect to his possession of the 22-caliber rifle.

It is argued that the tracks in the soft snow, in some way or another, how, it cannot be ascertained from the record nor the argument, corroborated defendant's story. The physical condition of the ground was testified to by several witnesses, but first noticed in detail by the witness Misner, a forest ranger, who scrutinized it at 9 A. M., April 20, the morning after the shooting. He testified positively to the finding of Bartrow's coat, the two sets of tracks there, the bullet marks on the willows, and declared with certainty there had been no blasting of the beaver dam prior to his search. Several witnesses testified to the tracks going up and down the roadbed and to tracks which left the railroad near the semaphore and went down into the water. But there is nothing in the record to show the snow was fresh, and many people had been in the vicinity some days after Misner's examination of the ground,

and testimony concerning footprints found three or four days after the tragedy afford no enlightenment.

In support of his motion for a new trial, defendant pre-
[3]   sented an affidavit which set forth, as newly discovered evidence learned since the time of the trial, that the beaver dam had been blasted shortly after the tragedy and the marks on the willows were caused by flying fragments of the pipe that was used as a container for the explosive. It is quite strange that counsel for the defendant cross-examined two witnesses on the very point of blasting the beaver dam. But the witness Misner positively declared there had been no blasting of the dam prior to his search of the willows, and that: "The blasting at this beaver dam was after I was there. I heard there was some blasting there." Proper diligence then and there should have moved counsel to discover, if he cared to, or did not know, the facts connected with the destruction of the beaver dam.

Eliminating all of defendant's case, the evidence was sufficient for the jury, under the rule of *Riggs Case*, and all of the circumstances, when coupled with defendant's own testimony, leave no room for any rational hypothesis of innocence.

For the reasons herein stated, we recommend that the judgment and order appealed from be affirmed.

PER CURIAM: For the reasons given in the foregoing opinion, the judgment and order appealed from are affirmed.

*Affirmed.*

Rehearing denied January 6, 1922.