STATE, Respondent, *v.* PEPO, Appellant.

[No. 1,455.]

[Submitted January 3, 1900. Decided January 22, 1900.]

*Criminal Law—Homicide—Jury—Misconduct of Officer—Trial — Evidence — Review — Exceptions—Necessity—Request to Charge—Charge on the Evidence—Corpus Delicti—Proof Required—Sufficiency of Evidence.*

1. Where the affidavit of a member of the jury convicting accused of murder stated that the bailiff remained in the same room with the jury an entire night, within hearing of their discussions, and conversed with some of the jurors; and the bailiff's counter affidavit stated that he entered the jury room about 1 a. m. to take the jury lunch and bedding, and thereafter slept just inside the door, at which time all but four of the jury had retired, and that he did not speak to any of the jurors about accused, and the case was not discussed in his hearing; and affidavits of other jurors showed that the bailiff did not mix with the jury, and took no part in the discussion of the case,—such affidavits showed no prejudicial misconduct of the jury towards defendant.
2. Permitting the prosecution to ask a witness as to a conversation between himself and deceased, over defendant's objection that he was not present, was not error, where the witness later testified to defendant's presence.
3. Exclusion of evidence will not be reviewed, in the absence of an exception taken to the ruling.
4. Where, in a prosecution for homicide, decedent's identity was in issue, it was not error to refuse defendant's request to charge that a witness having but a casual acquaintance with a party is entitled to comparatively little weight after a comparatively short lapse of time, since such request amounted to a charge on the weight of evidence.
5. Penal Code, Sec. 358, provides that no person can be convicted of murder or manslaughter unless the death of the person alleged to have been killed, and the fact of the killing by the defendant as alleged, are established as independent facts,—the former by direct proof, and the latter beyond a reasonable doubt. *Held* that, since the *corpus delicti* is directly proved when a dead body is found under circumstances warranting an inference that a person has been feloniously killed, direct proof of the identity of the victim is not required, but only direct proof of death.
6. Circumstantial evidence reviewed and, *held*, sufficient to sustain a verdict of murder in the first degree.

*Appeal from District Court, Teton County; D. F. Smith, Judge.*

William Pepo was convicted of murder, and he appeals. Affirmed.

*Mr. J. G. Bair* and *Mr. M. D. Baldwin*, for Appellant.

There was misconduct on the part of the bailiff in charge of the jury after they had retired to deliberate upon their verdict by which a fair and due consideration of the case was prevented. "The presence of the bailiff in the jury room with the jury, after it has been charged, is fatal to the verdict, and this, though he speaks no word to the jurymen." (American and English Encyclopedia of Law, First Edition, Vol. 16, p. 531, citing *People* v. *Knapp*, 42 Mich. p. 267; *Rickard* v. *Scott*, 47 Ind. p. 275, and numerous other cases.) The counter affidavits submitted by the state should not, we think, have been received or considered by the court. It will be observed that in these affidavits the affiants state that they were not influenced in their verdict by the presence of the bailiff. The bailiff, also, in his affidavit, sets forth in substance that he held no communication with the jurors, and that he did not discuss the cause with them. This affidavit, and in fact all the affidavits filed by the state, should go for nothing. (*Wright* v. *Eastlick*, 58 Pac. p. 87.) We do not believe it is pertinent to the question here under consideration whether the presence of the bailiff or any action of his while in the jury room had any influence upon the verdict or whether it had not. (*Palmer* v. *Railway Co.*, 13 Pac. 429.) The bailiff had no right to be in the jury room, no more right than the court itself had to be there, and his presence there during the hours of their deliberation was a grave irregularity. (*People* v. *Backus*, 5 Cal. p. 276; *Organ* v. *State*, 26 Miss. p. 78.) If the bailiff may be allowed to make his bed among the jurors, talk with them, and remain all night among them, why should it be deemed an irregularity if the sheriff, the clerk, or the court should take the same action. The bailiff is an officer of the court, and represents the court, and in this case, where the issue of life and death depended upon the verdict, the defendant is surely entitled to the benefit of every safeguard that would tend to render his trial a fair and impartial one, and free from every irregularity. (*People* v. *Backus*, 5 Cal. p. 276; *People* v. *Stokes*, 103 Cal. p. 194.) This defendant was entitled to have a trial of his cause by the

twelve jurors sworn to try his cause, and for the trial to be perfectly fair it must have been regular, so that no suspicion of influence from extraneous sources upon the verdict rendered could attach to that verdict. Such a trial he has not had, for not one of the eight jurors who have made affidavits denies the presence of the bailiff in the jury room during the night. (*People* v. *McCoy*, 71 Cal. p. 395; *People* v. *Brannigan*, 21 Cal. p. 388.) Under the authorities first cited in support of defendant and appellant's position, Am. and Eng. Ency. Law, Vol. 16, p. 531, and cases therein cited, the action of the bailiff was undeniably a grave misconduct, and a very unusual irregularity, an irregularity surely as imprudent and as foreign to any rules of good practice as those specific irregularities that appear in the cases subsequently cited, and from which we have quoted, an irregularity which, if allowed to stand as a precedent, especially in cases of as grave import as the case at bar, will subject the criminal practice of the state to a train of abuses that will be subversive of the commonest justice which the constitution guarantees an accused person. For further authorities on this point, see *People* v. *Azoff*, 105 Cal. p. 132; *Woodward* v. *Leavitt*, 107 Mass. p. 466; *McDaniels* v. *McDaniels*, 40 Vt. p. 374; *Knight* v. *Inhabitants of Freeport*, 13 Mass. p. 218.

In order to sustain a conviction in this cause, it is essential that the state prove, beyond a reasonable doubt, that the deceased was Julius Plath. This, we submit, the state has failed to establish by any reliable evidence whatever. There is no word of testimony by which the identity of the body found as being that of Julius Plath can, or ought to be, inferred, unless it be that the coat found upon the body resembled a coat once worn by Plath. State's witnesses Schmidt, Ormsby, Burd, Sulgrove, all agree that there was no trace of features remaining about the body when found; that the flesh was all gone from the face, and the teeth were scattered around the cot. There is not one word of testimony on the part of the state's witnesses that shows that by any examination whatever the remains were found to be those of a male person. Wit-

ness Arnold testifies that, as undertaker, he took charge of the body for burial; that the clothes were then on the body; that there was no flesh on the face at all. The same witness testifies that he did not know whether the remains he buried, and which are alleged by the state to have been those of Julius Plath, were the remains of a man or not. "Where only mutilated remains have been found, it ought to be clearly and satisfactorily shown that they are the remains of a human being, and of one answering to the sex, age and description of the deceased." (Greenleaf on Evidence, Vol. 3, p. 112.) "The most positive and satisfactory evidence of death is the testimony of those who, having been acquainted with the deceased in his lifetime, have seen and recognized his body after life was extinct. No less satisfactory measure of proof should be required in a capital trial." (Greenleaf on Evidence, Vol. 3, p. 112.) "Where there is no evidence upon a point essential to sustain the verdict, a new trial will be ordered." (*Cummins* v. *Scott*, 20 Cal. p. 84.) "To justify a conviction one must not only be proven to have committed an offense, but the very offense charged." (*People* v. *Fagan*, 98 Cal. p. 230.) "Judgment of the lower court will be reversed when the bill of exceptions shows that there was a total failure to prove the *corpus delicti.*" (*People* v. *Olivie*, 60 Cal. p. 69.) There is in the testimony no legal evidence in proof of the allegation that the deceased was Julius Plath, or even that the deceased was a male person. "Where the verdict does not have some meritorious support from the evidence, it will be set aside and disregarded." (*Smith* v. *Belshaw*, 89 Cal. p. 427.) "The court, on review of the proper motion made in the court below and there denied, will order a new trial where the evidence given at the former trial was without substantial conflict opposed to the verdict." (27 Cal. p. 40.) "In all criminal prosecutions, no matter what may be the kind of evidence on which they rest, the burden is on the prosecution to prove the *corpus delicti.*" "The death in homicide should be distinctly proven, either by inspection of the body, or other evidence strong enough to leave no ground for reasonable

doubt. The test is applicable to all crimes." (Wharton's Criminal Evidence, Ninth Edition, 244, citing 1 Starkie on Evidence, 575.) "A witness having but a casual acquaintance with a party is entitled to comparatively little weight after a short lapse of time." (See Wharton's Criminal Evidence, Eighth Edition, p. 806, Sec. 806, par. 1, under head of "Opportunities of Observation.")

*Mr. C. B. Nolan*, Attorney General, for the State.

MR. JUSTICE HUNT delivered the opinion of the Court.

The defendant, William Pepo, was charged with murder in the first degree by having killed one Julius Plath, about June 15, 1898, at Teton county.

About June 29, 1898, a dead body was found in a small cabin near Muddy river, in Teton county. The person who found it discovered that the door of the cabin was fastened on the outside with wire. The body was badly decomposed, the flesh having fallen away from the head, and the hair having fallen off. It was lying in a bunk, and was clad in a black shirt, vest, and black coat, with binding upon it; the trousers were very dark, with a stripe in them, and covered with overalls with a bib upon them. The little hair that there was about the head was of very dark brown color. The skull was mashed above the forehead, as if hit by a blunt instrument, and the brains had oozed out. The body measured five feet six inches in height. Upon the floor of the cabin, by the head of the bed, was a cracker box, in a handkerchief. There was also an overcoat found in the cabin, in which was a memorandum book. The shoes were upon the floor near the head of the bed, and by them was found a watch charm. There were no evidences of any struggle having taken place. There was also found near the cabin a heavy piece of iron, upon the end of which was blood and dark hair. This defendant was afterwards convicted of the crime of having murdered the person whose body was so found, and from the judgment sentencing him to death, and from an order denying his motion for a new trial, he prosecutes this appeal.

1.   The first point urged upon our attention is the alleged misconduct of the jury.   This is set forth in the affidavit of one of the jurors, named De Haas, who stated that after the court had instructed the jury, and upon the night of June 1, 1899, and during the whole of said night, the jury deliberated in their efforts to reach a verdict; that during the deliberations of said jury, and during the discussion of said cause, the court bailiff entered the jury room, at about 11 o'clock on said night, and remained in the jury room with the jurors during the entire night; that conversation and communication took place between the said bailiff and some of the jurors during said night, and that during all the night the said bailiff was in close proximity to all of the jurors, and within the hearing of all the discussions upon the case; that he remained in the jury room from midnight of said day until daylight of the next morning; and that the said bailiff departed from the jury room before the jury had reached and agreed upon a verdict. In opposition to this affidavit the bailiff, by counter affidavit, set forth that he did not enter the jury room where the jury were deliberating until about 1 o'clock a. m., June 1, 1899, at which time he took the jury a lunch and some bedding; that at that time he did not speak to any of the jurors about the case, and the case was not then being discussed within his hearing; that about 2 o'clock a. m. of said date he entered the jury room, and lay down just inside of and close to the door leading into the jury room; that at that time all the jurors had retired for the night, except four, one of whom was the juror who made the affidavit just heretofore referred to; that when he lay down the said jurors were in the remote part of the room from where he was; that the room in which the jury held its deliberations was 70 feet in length by 30 feet in width; that he fell asleep in a very few minutes after lying down, and that he heard no part of any conversation, if any there was, of the case by the jury; that at about 4 o'clock in the morning he woke, and left the room before the jury resumed their deliberations; that at no time during the night was he among the jury, nor was he present at any time when

the case was under discussion; that no conversation took place between him and the jury, or any of the jurors, about the case; that he neither said nor did anything with the intent to prejudice or bias the jury against the defendant, or in any way to influence any of them in rendering a verdict, but that he performed his duties as court bailiff honestly and conscientiously, and without bias or prejudice.

Adolph Fellers, one of the jurors, in his affidavit stated that about 1:30 a. m. the bailiff entered the room with bedding, and that about 2 o'clock all the jurors retired, except himself and three others; that after the jury had retired the bailiff came into the room and lay down by the door; that during the time the bailiff was in the room he had no communication with any of the jurors, and that the jury were not deliberating or discussing the case while he was in the room, but that the bailiff left the jury room in the morning, before the jurors who had retired were up, and before discussion of the case was resumed; that the bailiff did not mix with or discuss the case with the jury, or any of them, while he was in the jury room. Other jurors corroborated the statement contained in Fellers' affidavit.

John Jackson, Sr., who was one of the jurors who did not retire before the bailiff came into the room, also filed an affidavit in which he said that when the bailiff came into the jury room there was no conversation between the jurors and the bailiff about the case under consideration, and that the bailiff at no time mixed with the jury or took part in the discussion of the case, but that he left the room before the jurors who had retired were up.

From the foregoing affidavits we think it is fair to say that there was no misconduct on the part of the jury which tended in any way to prejudice the substantial rights of this defendant. Although it has been held by some courts that the mere presence of the bailiff in charge of a jury in the jury room during their deliberations will vitiate the verdict, the rule established in this jurisdiction is different, for it was laid down in *State v. Jackson*, 9 Mont. 508, 24 Pac. 213, that if misconduct be

shown, tending to injure the defendant, prejudice is presumed, but not absolutely. "The state," said the Court, "may remove that presumption, and the burden is upon it to do so, and in so doing it may use the testimony of the jurors to show facts which prove that prejudice or injury did not or could not occur." The finding of the district court that there was no prejudice is so clearly sustained that we are not authorized to disturb it. The affidavit of juror De Haas, upon which the defendant relies, in itself fails to show any prejudice, other than such as might be deduced from the presence of the bailiff in the jury room while four of the jurors were up and possibly discussing the case; and whatever presumption might have been raised by that fact alone is well rebutted by the counter affidavits upon which the district court made its finding. (*Doles* v. *State*, 97 Ind. 555; *Fitzgerald* v. *Goff*, 99 Ind. 28; *State* v. *Hopper*, 71 Mo. 425; *State* v. *Summers*, 4 La. Ann. 26; *Territory* v. *Clayton*, 8 Mont. 1, 19 Pac. 293; *Territory* v. *Burgess*, 8 Mont. 57, 19 Pac. 558; *State* v. *Jackson*, 9 Mont. 508, 24 Pac. 213; *State* v. *Anderson*, 14 Mont. 541, 37 Pac. 1; *State* v. *Gay*, 18 Mont. 51, 44 Pac. 411.)

2. Error is assigned because the court overruled an objection to a question propounded to a witness, asking him to state a conversation between Julius Plath, the deceased, and witness; the ground of the objection being that the defendant was not shown to have been present at the conversation. There was no error in this ruling, inasmuch as witness stated later on in his testimony that at the time of this conversation the defendant was present.

3. A witness named Kropp testified that he had seen a man resembling the photograph of Plath a day or two before the alleged killing, and took him to be a man of 22 or 23 years of age. Thereupon, upon cross-examination, defendant's counsel asked witness how old a man he would take Mr. Wright to be. The state objected, and the court sustained the objection. No exception appears to have been taken to the ruling of the court; hence we pass the matter.

4. The court refused to charge, as requested by the

defendant, that ''a witness having but a casual acquaintance with a party is entitled to comparatively little weight after a short lapse of time.'' The instruction was correctly refused, — to have given it would have been serious error. It is a plain direction to the jury in relation to the weight to be given to the testimony of a witness. (*State* v. *Gleim*, 17 Mont. 17, 41 Pac. 998, 31 L. R. A. 294; *State* v. *Gay*, *supra*.)

5. We are also asked to reverse the judgment because the verdict is not sustained by the evidence. To this assignment we have given the most attentive consideration, and our judgment is that it is very seldom that a case presents itself which so entirely fulfills the exact requirements of the law in relation to the measure of proof demanded to sustain a conviction of murder where the state relies upon circumstantial evidence. Under this assignment the argument is advanced that the evidence as to the identity of the body is unreliable and unsatisfactory. Counsel make the point that there was no direct evidence to identify the body found as that of Julius Plath, who was alleged to have been killed by the defendant, Pepo. Section 358 of the Penal Code provides that ''no person can be convicted of murder or manslaughter unless the death of the person alleged to have been killed, and the fact of the killing by the defendant as alleged, are established as independent facts; the former by direct proof and the latter beyond a reasonable doubt.'' This statute is taken from the New York Code, wihich is identical in its language, with this exception: That the New York Code provides that the death of the person alleged to have been killed, and the fact of the killing by defendant as alleged, shall *each* be established as independent facts. But we think that the same rules of interpretation should be applied to the Montana statute that control in New York. In *People* v. *Palmer*, 109 N. Y. 110, 16 N. E. 529 (a case in many respects similar to the one at bar), the court of appeals considered the section under discussion, and concluded that in prohibiting a conviction of murder or manslaughter unless the death of the person alleged to have been killed, and the fact of killing as alleged,

are each established as independent facts (the former by direct proof, and the latter beyond a reasonable doubt), the law does not require direct proof of the identity of the victim, but only of death.  It is made clear by the learned opinion of Judge Finch that the *corpus delicti* means the existence of a criminal fact.  That such a fact exists is directly proved when a dead body is found under circumstances such as were brought out on the trial of this case.  But, by requiring the *corpus delicti* to be established by direct proof, the law does not include the identity of the murdered man, but leaves that open to indirect or circumstantial evidence, to be established on the trial.  ''The requirement of the Code,'' say the Court, ''goes upon the assumption that the identity of the deceased, either by name or description, has been established in the ordinary way, and then requires that the death of that person thus identified shall be directly proved, and the killing by the prisoner of the same person shall be shown beyond a reasonable doubt.  Those two facts alone are the subject of the legislation, and they are properly referred to as 'each,' and correctly described as the 'former' and the 'latter:'  No purpose to change the settled rule of the common law is disclosed, but simply an intent to declare it as it had long existed.''

The evidence in all respects sustains the verdict of the jury. It appeared that Julius Plath and this defendant knew one another well in the dominion of Canada, and that they said when leaving there that they were going to this section of the United States.   Plath had about $120 in money when he left Canada.   He was clad in blue overalls, with a bib, black coat, with braid upon it, and black shirt.   Defendant and a shorter man, recognized by photographs as Plath, were together in Teton county, at or near a railroad station not many miles from where the body spoken of was subsequently found, a day before June the 15th.   Pepo and Plath both had sacks of clothing shipped to them at Shelby from Lethbridge. For these they never called.   The two men were seen together by several ranchmen about June 13th or 14th, going towards Choteau.   The people who saw the two identified one as

resembling the photographs of Julius Plath, and said that he had on a black coat, with binding, blue overalls, with a bib, and a watch chain with a charm hanging from it, and that he carried a small box in a handkerchief. Pepo carried some bedding. They inquired the direction to the town of Choteau, and about June 14th were told by a farmer that if they were overtaken by night they could find a place to sleep in a little log cabin about five miles from his place; and towards this log cabin they took their footsteps. It was in this cabin that the body was afterwards found. Nothing more was ever seen of the smaller man, recognized by photographs as Julius Plath. The defendant was seen several weeks afterwards near the city of Great Falls, where he asked the way of a trail through the mountains. About nine months afterwards the defendant was arrested in the state of Washington. He was then living under an assumed name, and, when arrested, told the sheriff that the watch chain which he was wearing did not belong to him, and he wished to give it to the man on the place where he was working, who owned it. No one claimed the chain there, however, and it was brought back to Montana by the sheriff. The coat found upon the dead body was identified by the persons who had seen the two men before as having been worn by the shorter man, and particularly was it recognized by the brother of the deceased, who pointed out a hole in the side of the coat that had been torn, and sewed up by his mother, before his brother, Julius, left his home in Canada, months before. The blue overalls on the body were identified as being such as Plath had worn. The shirt was also identified. So were the trousers on the body. The color of the hair and the height of the body were sworn to as corresponding with Plath's. The watch charm picked up on the floor of the cabin was also recognized by a child who had seen the two men at the ranch of her father the day before the murder was alleged to have been committed, June 15th, and who observed the charm on the smaller man's vest. In the pocket of the overcoat found in the cabin where the body lay was a memorandum book containing entries sworn to have

been made in the handwriting of defendant, Pepo. A blanket found near the body was recognized to be the same one that Pepo had had in Canada a year before. The watch chain which Pepo wore at the time of his arrest was said to resemble the one that deceased had had on. A cracker box, with some crackers in it, and a handkerchief, found on the floor of the cabin, near the body, were identified as resembling ones that had been observed in the possession of the smaller man by several persons who had seen the men a few days before the murder was said to have been committed. The defendant denied that he had been with Julius Plath at all in Montana, and denied that he had seen any of the persons who said they recognized him. But the truth or falsity of his story was a matter exclusively for the jury, and cannot be accepted by us at this time as sufficient to overthrow the overwhelming force of the evidence on the part of the state.

We find no error in the record, and must affirm the judgment and order appealed from.

*Affirmed.*