STATE, RESPONDENT, v. WEBBER, APPELLANT.

(No. 8,162.)

(Submitted May 26, 1941.   Decided June 28, 1941.)

[116 Pac. (2d) 679.]

286

*Mr. Frank Blair* and *Mr. Miles J. O'Connor,* for Appellant, submitted an original and reply brief, and argued the cause orally.

*Mr. John W. Bonner,* Attorney General, *Mr. Fred Lay,* Assistant Attorney General, *Mr. John M. Comfort,* County Attorney of Madison County, and *Mr. Wellington D. Rankin,* for Respondent, submitted an original and a reply brief; *Mr. Lay, Mr. Comfort* and *Mr. Rankin* argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

The defendant charged by information was convicted for receiving stolen property and sentenced to a term of three years in the state penitentiary. He has appealed from the judgment.

No issue is made as to the sufficiency of the information to sustain the charge made, and the information will not be repeated here.

The principal contentions of the defendant are:

(1) That the *corpus delicti* was not established;

(2) That the court erred in its Instruction No. 8;

(3) That there was insufficient evidence to sustain the verdict;

(4) That the verdict and judgment are contrary to law;

(5) That if defendant be guilty of any crime it is that of larceny, and that being true he could not be guilty of receiving stolen property from himself.

The evidence introduced on behalf of the state may be summarized as follows: Felix Dufrene, an employee of Mrs. Josephine Howard, the owner of a ranch about five miles out of Pony, Madison county, Montana, on which she ran a small herd of cattle, having noticed car tracks along a private roadway on the Howard premises followed the trail of the car to where he found the carcass of one of Mrs. Howard's calves and the head and feet and entrails of another calf. Dufrene noticed where one of the calves had been dragged for two or three hundred feet, and he found the head, feet and entrails just referred to in a ''wash-out.'' Dufrene reported to Mrs. Howard what he had discovered and she sent a Mr. Knight, who was staying on the ranch, to Pony with instructions to telephone the sheriff at Virginia City. Both Mrs. Howard and Knight traded at defendant's store in Pony and Knight went there to make his telephone call. He advised the sheriff of the reason for the call and arranged to meet him on the highway leading to the Howard ranch. The defendant overheard at least a part of the phone conversation, and made some comment relative thereto. Dufrene remained at the scene where the calves had been killed until the arrival of the sheriff. The carcass of one calf had been partly skinned and left, but the body of the other calf and the hide were missing. These discoveries were made on November 12, 1939.

November 23rd one Edward Olind, who with a brother, while on the way horseback to his brother-in-law's for Thanksgiving dinner was overtaken on the way by his brother-in-law who advised them to leave their horses in the barn of an abandoned farm and go the rest of the way with him in his car. The Olind brothers went into the barn to leave their horses and Edward discovered two quarters of a beef in an oats box in the

barn, which discovery he reported, on the advice of his father, to the stock inspector.

November 28th one Leonard Stone was arrested for the killing and theft of the Howard calf, purchased by the defendant, admitted his guilt and was sentenced to three years in the penitentiary, and implicated the defendant. The sheriff and county attorney of Madison county and a state stock inspector went to Pony to interview the defendant, taking Stone along in the custody of a deputy sheriff, but Stone was left outside in the car with the deputy while the others interviewed the defendant. It appears that the sheriff had previously inquired of the defendant if Stone had attempted to sell him any meat, which question the defendant answered in the negative and stated further that everyone in Madison county knew Leonard Stone to be a thief, that he had no reputation and no businessman would have any dealings with him. When the sheriff and the other parties went to see the defendant on November 28th, the stock inspector testified that he, in the presence of the sheriff and county attorney had the following conversation with defendant: "I asked Mr. Webber if Leonard Stone had ever sold or offered to sell him any beef, and Mr. Webber stated that Mr. Stone had never sold him any beef and had never offered to sell him any. At that time Mr. Webber said that he would not have bought any beef from him, Stone, because he said, 'This fellow is a bad character and he had a bad reputation, and it would hurt my business if I had any business with him.' Mr. Webber at that time stated he had not had anything to do with him. Mr. Webber also stated that Mr. Stone had never brought any beef to him."

When the stock inspector and sheriff and county attorney had this conversation with the defendant in his apartment in the rear of his store at Pony, Stone and a deputy sheriff by the name of Whiting remained in the car outside and when the defendant made the foregoing statement in the presence of the parties mentioned, the stock inspector said to the defendant that he had a witness outside that he, the stock inspector, would like to bring in and the defendant told him to bring him in.

Stone was brought in and confronted the defendant. Stone at that time and in the presence of the officers mentioned said to the defendant, "You know, Joe I did bring this beef in here; you know I drove my car * * * right down back of your place. * * * You took your flash light and came out there and showed me where to put the beef, and I carried the beef in and put it on that table in the room where you told me to."

Shortly after Knight telephoned the sheriff about the killing of the calves the defendant went to see a brother-in-law of Stone's by the name of Lau, who worked in a garage not far from defendant's store, and Lau testified that the defendant told him of the telephone conversation that Knight had had with the sheriff, and the defendant wanted Lau to get word to Stone to be on the dodge and suggested that Lau drive to the Revenue Mine, some four or five miles out of Norris, where Stone worked, and tell him about Knight's conversation with the sheriff. Knight testified that he had no notion whatever as to who killed the calves when he telephoned the sheriff, and no names were mentioned in the phone conversation between Knight and the sheriff.

When the sheriff, stock inspector and the other parties had the conversation with the defendant on November 28th, the county attorney testified as to this conversation between himself and the defendant: "Why did you send the boy to get Leo Lau to tell Leo Lau to come down, that you wanted to see him? In response to that Mr. Webber said, 'I did send the boy up.' Mr. Comfort then said, 'You went up; Leo didn't come down and you went up to see Lau, you went up and told Lau to have Leonard Stone get out of the country right away, that the sheriff was after him. Why did you do that?' In reply to that Mr. Webber said, that he figured that Leonard Stone was in trouble and he didn't want to get mixed up in it himself, it would hurt his business, so he thought maybe it was all right to tell Leonard to get out. When I said to Mr. Webber, 'Mr. Webber, the sheriff was down here in the first place and he talked to you and he asked you if you bought any meat from Leonard Stone and you told him "No." In reply to my

statement Mr. Webber said, 'Yes, that is what I told him, "I did not." ' "

Lau, it seems, was quite friendly with the defendant and the court permitted him, even though a state witness, to be examined by the state as a witness antagonistic to the state.

On December 18, 1939, the defendant went to see Mrs. Howard, the owner of the calves, and paid her $25 for the carcass of one which he had purchased from Stone, and dictated a letter which Mrs. Howard signed and which she delivered to the defendant to be mailed to the county attorney. The letter was in the following language:

"I am writing to let you know that Mr. Joe Webber came up to the ranch and settled with me for the veal which Leonard Stone sold to him. And he gave me a check for $25.00 this morning.

"And Mr. Joe Webber tells me that he was perfectly innocent when he bought the veal as Mr. Stone told him he got it from Leo Lau. And I think he was innocent." The defendant was placed under arrest the same day.

It appears from the record that Stone had been a customer of the defendant for a number of years, and a year or two before Stone butchered the calves involved in the action the defendant attached Stone's wages due from the Revenue mine, and Stone appears to have been continually hard-up and wasteful of what money he earned or obtained, and on November 10, 1939, he took a pump to the defendant's store which he desired to sell to the defendant. After some negotiations the defendant bought the pump for $25, paying part cash and applying part on Stone's account. After that transaction was consummated, Stone testified that the defendant said to him that he would pay him $25 for a couple of beef and the defendant mentioned that on a recent visit up Camp Creek, which was in the neighborhood of the Howard ranch, he had seen some young critters, and he would take two of them if they were not too large. Stone testified that there was no agreement as to how he was to get the calves but it was obvious that defendant knew that Stone had no money with which to buy them.

Following this conversation, Stone testified that he went up Camp Creek, saw the two calves that he afterwards killed, shot one and started to skin it and then the other one came along and he shot that one. He dragged one of them two or three hundred feet, cut off the head and feet and took out the entrails and loaded it in his car, after having thrown the head and feet and entrails into a hole or wash-out. He admitted killing the calf that was partly skinned, but it does not appear why he abandoned the carcass. He took the carcass of the one calf to Pony, and entered the defendant's store where other persons were present and said to the defendant that he had brought the pump parts. He testified that this was the code statement he had agreed on with the defendant as to what he would say when he brought the "meat" in if other persons were present at the time.

The calf was in the back part of his car with a cover of some kind thrown over it. The car was parked in the street not far from the defendant's store. Stone and the defendant went out and looked at the carcass and defendant told Stone that he could not use it unless it was skinned. Stone desired to skin the calf in the defendant's garage, to which the defendant would not agree, but suggested a deserted place out of town where the skinning could be done. After some little conversation about the matter, Stone concluded that he could find a better place himself and drove out a few miles in the country to a place he had decided upon and when he got there found that he did not have a suitable knife with which to skin the calf and returned to the store, and he testified that he obtained a knife from the defendant but the defendant denied that he furnished the knife. Before leaving town in quest of a place to skin the calf, Stone told the defendant he could not go around with the blood he had on his clothes from butchering the calf. Stone went into the defendant's apartment in the rear of the store and on defendant's instructions a clerk brought a shirt, overalls and boots which Stone put on in the defendant's apartment. Stone returned some time about one o'clock the next morning with the calf skinned, knocked on the back door of the defendant's apart-

ment and told him that he had brought the meat. Defendant got up and went with him and had Stone carry the meat to where defendant desired to have it placed. The defendant testified that they took the meat to the basement for the reason that that was the coolest place he had and his refrigerator was too small to hold it. The defendant paid Stone $12.50 at that time and agreed to pay the balance later. (The testimony here recited is, in substance, that of the defendant.)

A day or two after the meat was delivered at the store, the defendant used a part of it to make some hamburger, then after the story got around about the killing of Mrs. Howard's calves the defendant appears to have become uneasy and took a part of the meat and threw it into some near-by timber and brush, which he testified he did for the reason he did not want to be mixed up in the matter after it was rumored that Stone had stolen the calves and he threw it out for the dogs and cats and chickens to eat, and two other quarters he took out to the Tinsley ranch some four miles out of the town of Pony and put them in an old oats box in an abandoned barn, which was afterwards discovered by the witness Olind, as heretofore mentioned.

The defendant testified that he paid Mrs. Howard for the calf for the reason that he thought he could better afford to lose the money than she could, that she had been a good customer and he wanted to protect her; and she testified that she willingly signed the letter that was sent to the sheriff as outlined by the defendant for the reason that she had traded with him and that he had always been very pleasant and agreeable and accommodating to her.

We have recounted merely the more important statements of the various witnesses, but taken on the whole the evidence is such that we think it establishes the guilt of the defendant beyond a reasonable doubt. With this résumé of the more important part of the testimony of the witnesses, including that of the defendant himself, we will now take up the different contentions of the defense in the order heretofore mentioned.

(1) As to the *corpus delicti*, it has been said that the "*corpus delicti* means the existence of a criminal fact." (*State*

v. *Pepo,* 23 Mont. 473, 482, 59 Pac. 721; *State* v. *Nordall,* 38 Mont. 327, 99 Pac. 960.) Among many other definitions given in the books it is said the *"corpus delicti* is the body of the crime."* (9 Words and Phrases, Perm. Ed., 753.) In homicide cases the conviction of an accused person cannot be had unless the *corpus delicti* is established by direct evidence. (Section 10962, Rev. Codes; *State* v. *Pepo,* supra; *State* v. *Dixson,* 80 Mont. 181, 192, 260 Pac. 138; *State* v. *Wells,* 33 Mont. 291, 83 Pac. 476.) But the general rule is that in crimes other than homicide, such as the case at bar, the *corpus delicti* may be established by circumstantial evidence. (*State* v. *Keeland,* 39 Mont. 506, 104 Pac. 513, and cases cited above.) The evidence amply establishes the *corpus delicti* in this case. Mrs. Howard had but 28 head of cattle, among which were ten cows and calves. The two calves were killed without her knowledge or consent and were identified beyond question. The mother of the calf the carcass of which was sold to the defendant was a milk cow and the witness Dufrene did the milking at the Howard ranch and stated that he frequently milked the mother of the calf on one side while the calf sucked on the other. He identified the head and feet, and described the calf's color and markings, and when he found the dead calves the mothers were there showing their natural distress over their dead calves. The other calf that was killed was from a beef cow that was not milked and that calf was not so gentle as the milch cow's calf, but Dufrene testified, "those calves were like sheep. They ran around the barn and you had to kick them out of the way." The head and feet of the carcass that was purchased by the defendant were fully identified as the milch cow's calf by both Mrs. Howard, the owner, and Dufrene. After Dufrene discovered the calves had been killed he watched closely to see that nobody came back to get the carcass of the calf that was partly skinned and as soon as the sheriff arrived the head and feet of the calf were turned over to him; they remained in his custody until the trial, were inspected by the jury on the mutual assent of counsel for the state and the defendant and admitted in evidence. No question is raised as to the calves having been

killed without the consent of Mrs. Howard, and these facts along with other testimony relative thereto clearly establish the body of the crime and this first contention of the defendant is without merit. Furthermore, the *corpus delicti* may be established upon the testimony of the thief alone. (2 Wharton's Criminal Law, 12th Ed., sec. 1230, p. 1544.) Stone testified to the killing and asportation of the calf.

(2) On the question of error as to the court's instruction ██ No. 8, that instruction is in the following words:

"No 8. You are instructed that, in determining whether or not the defendant knew the personal property described in the information and alleged to have been purchased or received by him had been stolen at the time he purchased or received same, if you find he did, you are to consider all the facts in the case and the circumstances surrounding the transaction. It is not necessary for the State to prove that he had such knowledge either from actual personal observation, or from information given by others. The guilty knowledge of the defendant upon this subject may be inferred from all the facts and circumstances appearing from the evidence. If, therefore, you find from the evidence beyond a reasonable doubt that the defendant purchased or received the property as charged in the information under such circumstances as convinces you beyond a reasonable doubt that at the time alleged he knew the same to have been stolen you will be justified in finding that fact and returning a verdict of guilty if the other elements of guilt are established beyond a reasonable doubt."

The objection as to this instruction is set out by counsel for the defense in five separate divisions. But the whole is in effect that it is an incorrect statement of the law and is prejudicial to the defendant. We discover no error in the instruction. The rule is that instructions shall be considered in their entirety. "Instructions must be read and considered as a whole." (*State* v. *Byrd,* 41 Mont. 585, 111 Pac. 407; *State* v. *Houk,* 34 Mont. 418, 87 Pac. 175; *State* v. *De Lea,* 36 Mont. 531, 93 Pac. 814; *State* v. *Colbert,* 58 Mont. 584, 194 Pac. 145; *State* v. *Cassill,* 71 Mont. 274, 229 Pac. 716; *State* v. *McComas,* 85 Mont. 428,

278 Pac. 993.) Reading the instructions as a whole we find no fault in them and are satisfied that all the rights of the defendant were carefully guarded by such instructions.

Contentions (3) and (4), covering as they do practically the same issues, will be considered together. They challenge the sufficiency of the evidence to sustain the verdict and judgment. Determination of the weight of the evidence and the credibility of the witnesses come within the sole province of the jury, and the jury's verdict was that the defendant was guilty as charged.

Stone admitted the killing of the calves and the sale of the carcass of one of the calves to the defendant under circumstances which can leave no doubt in the unprejudiced mind that the defendant knew they had been stolen. His subsequent acts in attempting to get Stone out of the country before anyone except himself appears to have had any suspicion that Stone stole the calves, his receiving the meat under the subterfuge that Stone came to deliver parts of the pump which he had bought, his concealing a part of the meat in an abandoned barn, and throwing the rest in a secluded place for the dogs and chickens, his paying Mrs. Howard for the calf, the carcass of which he had purchased from Stone, and inducing her to write the letter to the sheriff in his behalf, his denying when first asked about the meat that Stone had attempted to sell him any meat, and saying in substance that he would have nothing to do with Stone on account of his bad reputation and thereafter sitting mute when confronted by Stone, who told him in the presence of the sheriff, the deputy sheriff, the county attorney and the state stock inspector that he, the defendant, knew that he bought the meat from Stone and that he had better come clean, and above all the defendant's own testimony and admissions on the witness stand and in a signed statement, and his desire to confer with the county attorney privately when accused by Stone, supply a chain of circumstantial evidence that leaves no reasonable ground to assume the defendant is innocent of the crime charged. The evidence clearly supports the jury in returning a verdict of guilty and we are satisfied defend-

ant's guilt was established beyond a reasonable doubt, and that both the verdict and judgment are justified. The acts of the defendant arising from his sense of guilt and his own incriminating testimony were obviously what led to the verdict of guilty. Stone's testimony merely pointed the way to discovery of the necessary evidence.

(5) It is contended with great earnestness by counsel for the ▮ defendant that if defendant be guilty of any crime it is that of larceny and that being true he cannot be guilty of receiving stolen property from himself.

Under this contention it becomes necessary to define the legal relations between Stone, the confessed thief of the calf, and the defendant Webber, the receiver of the stolen carcass. It is our view that the evidence clearly shows the defendant was a principal in the theft of the calf under the provisions of section 10732, Revised Codes, which provides:

"All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, and all persons counseling, advising, or encouraging children under the age of fourteen years, lunatics, or idiots, to commit any crime, or who, by fraud, contrivance, or force, occasion the drunkenness of another for the purpose of causing him to commit any crime, or who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals in any crime so committed."

By section 11863 the distinction between an accessory before the fact and a principal was abrogated. The distinction made between the principal offender and an accomplice is chiefly to gauge the value of testimony given by one against the other. Whether one be charged with crime as a principal or an accomplice, he may not be convicted of the crime charged on the uncorroborated testimony of an accomplice or his co-principal.

An accomplice is one who is guilty of complicity in the crime charged, either by being present and aiding and abetting in it, or by having advised and encouraged its commission,

thought absent at the time (*State* v. *Spotted Hawk,* 27 Mont. 33, 55 Pac. 1026) ; one who knowingly, voluntarily and with common intent with the principal offender, unites in the commission of a crime (*State ex rel. Webb* v. *District Court,* 37 Mont. 191, 95 Pac. 593, 15 Ann. Cas. 743) ; and if he was not present joining in the larceny he must also have advised and encouraged its commission. (*State* v. *Keithley,* 83 Mont. 177, 271 Pac. 449, and *State* v. *Slothower,* 56 Mont. 230, 182 Pac. 270.)

From the evidence we are satisfied that under·our statutes and the decisions of this court the defendant was a principal in the crime to which Stone pleaded guilty, even though not present and personally participating therein. Reasoning from that obvious fact, counsel for defendant presents the rather remarkable argument that if defendant be guilty of any crime it is that of larceny, and such being the case he cannot be guilty of the crime of receiving the stolen property; authorities are cited to support such argument, amongst which is the case of *State* v. *Keithley,* supra. It was said in that case that ''the rule generally recognized is that one who is guilty of larceny cannot be adjudged guilty of receiving the property stolen (1 Wharton Crim. Law (11th ed.), sec. 1232; 2 Bishop New Crim. Law, sec. 1140; *Adams* v. *State,* 60 Fla. 1, 53 So. 451, and note to report of case in Ann. Cas. 1912B, 1209) * * * Larceny and knowingly receiving stolen property are separate and distinct crimes under our statute (secs. 11368 and 11388, Rev. Codes, 1921), and therefore one who steals property is not an accomplice of one who receives the property knowing it to be stolen (11 C. J., p. 683; 17 R. C. L., p. 86; *Mayes* v. *State,* supra [11 Okla. Cr. 61, 142 Pac. 1149]) ; * * * However, it is worthy of note that many respectable authorities hold that a prosecution for receiving stolen property may be maintained against one who aided and abetted in commission of the larceny, and who afterward received the property from the person who actually committed the theft, for the reason that the receiving of the property is subsequent to the larceny in fact and not a part of it (*Smith* v. *State,* 59 Ohio St., 350, 52 N. E. 826; *Jenkins* v.

*State*, 62 Wis. 49, 21 N. W. 232; and on such theory it is held that the thief is not an accomplice with him who receives the property, and that therefore a conviction may be sustained for knowingly receiving stolen goods upon the testimony of the thief alone. (See note to case of *Leon* v. *State* (Ariz.), 9 A. L. R. 1937, and note to case of *People* v. *Kupperschmidt* (N. Y.), 32 A. L. R. 449.) ''

We have reviewed all the authorities cited in the case of *State* v. *Keithley* on the point that ''one guilty of larceny cannot be adjudged guilty of receiving the property stolen,'' and we find that none of the authorities sustain the construction of the phrase used in the *Keithley Case* that defendant contends for. The citation of 1 Wharton, 11th ed., sec. 1232, is carried forward verbatim into the later, 12th edition, Volume 2, as section 1234. (The citation in the *Keithley Case* should be 2 Wharton, instead of 1, as section 1232 of the 11th edition is in Volume 2.) Section 1234 of the 12th edition is as follows:

''As an elementary principle, if larceny by the defendant be proved, though the offender appear only to be a principal in the second degree, the charge of receiving falls, because the offenses are substantially distinct, and because there can be no guilty reception unless there be a prior stealing by another. But this reasoning fails, when on an indictment for receiving, proof transpires to show that the defendant was also an accessory before the fact. The offenses are so distinct that one cannot be said to merge in the other, nor is conviction of the one in any way incompatible with conviction of the other. Hence, in defiance of such testimony the defendant, if there be sufficient evidence of guilty receiving, may be convicted of such receiving.''

The first sentence of section 1234, taken alone would sustain defendant's contention, but the remainder of the section clearly supports the conviction of the defendant for receiving stolen property in this case.

Section 1140 of 2 Bishop, New Crim. Procedure, cited in the *Keithley Case*, we think, must have been taken from an old edition. Subdivisions 5 and 6 of section 1015a of the second edition state:

"5. No form of verdict will be good which creates a repugnancy or absurdity in the conviction. For example,—

"6. Since one cannot both steal a thing and commit the offense of receiving it from the thief, if an indictment charges him, as it may, with the former in one count and the latter in another, a general verdict of guilty, being inconsistent, will not sustain a judgment."

That textwriter cites the following cases to sustain the statement quoted: *Commonwealth* v. *Haskins,* 128 Mass. 60, and *State* v. *Rowe,* 142 Mo. 439, 44 S. W. 266. In the Massachusetts case the indictment charged the defendants in one count with the larceny of a cow, and in another count with receiving the same stolen cow. The jury returned a verdict of guilty against both defendants on both counts. After the verdict the prosecutor entered a *nolle prosequi* as to one count, which was held ineffective. On appeal the court said: "As a legal effect of a conviction on each count it cannot be said strictly that it is an acquittal upon the other; yet the finding of guilty upon both is inconsistent in law, and is conclusive of a mistrial. It would have been quite proper, before the record and affirmation of the verdict, for the presiding judge to have called the attention of the jury to their misunderstanding of his previous instructions, and to have explained to them the mode by which it became their duty, if they convicted upon either of the counts, to acquit upon the other, and to have required of them to retire for further deliberation; if, after such instructions, the jury persisted in returning a general verdict of guilty upon both counts, it would have been proper in the presiding judge, if not his duty, to set aside the verdict as the only means of securing to the defendants their rights. After the affirmation of the verdict, when there was no means of knowing of record upon which count the jury intended to convict, as there was no right in them to convict upon both, to assume that the error is corrected by a *nolle prosequi* of either count by the district attorney, is to permit the district attorney to determine, instead of the jury, upon which count the defendants were guilty."

In the Missouri case the defendant was charged in one indictment for burglary in the second degree and larceny; the jury found the defendant "guilty as charged"; the punishment was fixed at five years in the penitentiary. The statutory penalty for burglary in the second degree was "not less than three years" but it could be for life as the maximum was not prescribed; the penalty for larceny in conjunction with burglary was not less than two nor exceeding five years. The court reversed the judgment and ordered a new trial on the ground that the defendants could not be convicted for both crimes under such an indictment.

The note to Ann. Cas. 1912B, 1209, cited in the *Keithley Case* follows the report of the case of *Adams* v. *State*, 60 Fla. 1, 53 So. 451, and contains excerpts from decisions on both sides of the controversy, but in none of the authorities do we find where one shown by the evidence to be guilty as a principal and also guilty of receiving the stolen goods may not be convicted of one or the other of the crimes but not of both, at least in the same indictment or information.

In the *Keithley Case,* supra, *Adams* v. *State,* 60 Fla. 1, 53 So. 451, is quoted from, as follows: "One who, jointly with another, takes part initially and feloniously in the caption and asportation of property, may not be convicted of receiving the stolen property." We are of the opinion that our section 10732, Revised Codes, does not admit of such distinctions. In the body of that opinion we find these expressions:

"The serious question before us is, assuming that the evidence would have justified a verdict of guilt upon the count charging larceny of the cow, are there sufficient facts upon which the jury might have found an asportation prior to the reception by Adams? * * * . The crime of larceny is graded and punished, but not defined; and it would seem clear that the quoted statute is not intended to punish the thief, by way of a double penalty, but it is directed against those who would make theft easy or profitable. * * * It seems to be generally admitted that one who *alone* commits larceny cannot be adjudged guilty of receiving the thing stolen, * * * .

The difficulty comes in where the actual thief was aided by the accused in the commission of the crime, and as to this the true rule, it seems to us, has been stated by the Supreme Court of Ohio: 'We see no reason, however, why a confederate of the thief may not be guilty of both receiving and concealing the property which the latter has stolen; and it appears to be an established rule that a prosecution for receiving or concealing stolen property may be maintained against one who was present, aiding in the commission of the larceny, and receiving the property from the principal.''

Larceny and receiving stolen property are under our statutes separate and distinct crimes and where as here the evidence shows the defendant guilty of both crimes, we think it is optional with the state to prosecute the offender for either.

The other contentions of the defendant are without merit.

The judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON:

I concur in the result but not in all that is said in the opinion. I particularly disagree with the statement that the evidence clearly shows that the defendant was an accomplice, and therefore a principal to the actual theft by Stone, which is a matter not necessary to the decision. All that it is necessary to say on that point is that even if the evidence did so indicate, the prosecution could properly, under the authorities cited and the facts of this case, elect to prosecute him for the clearly indicated crime of receiving stolen property. Defendant's argument is that the larcener cannot physically receive from himself the thing which he has stolen; but that argument logically applies only to a larcener who participated in the actual asportation and therefore already has the actual physical possession. Under the facts of this case it is a legal fiction that Webber, if a party to the larceny, already had possession of the thing stolen; and in my opinion it is illogical to carry that fiction so far as to base upon it the further fiction that it is impossible for him ever to receive the actual physical possession, as distinguished from his constructive

possession as an accomplice, so as to be guilty of receiving stolen property.

ASSOCIATE JUSTICES ANGSTMAN, ERICKSON and ANDERSON: We concur in what is said above by the Chief Justice.

Rehearing denied September 17, 1941.